UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ANTHONY JOSEPH FARINA,

      Petitioner,

v.                                      CASE NO. 6:06-cv-1768-Orl-36GJK

SECRETARY, DEPARTMENT OF
CORRECTIONS, et al.,

      Respondents.

_____

## ORDER

This case is before the Court on the Amended Petition for Habeas Corpus Relief

(Doc. No. 49) filed by Anthony Joseph Farina.  Pursuant to the instructions of the Court,

Respondents filed a Response to the Amended Petition for Writ of Habeas Corpus (Doc.

No. 61).  Thereafter, Petitioner filed a Reply to the Response (Doc. No. 690).  For the

following reasons, the Court finds that Petitioner is not entitled to relief on his claims.

## I.    *Statement of the Facts*

The facts adduced at trial, as set forth by the Supreme Court of Florida,[1] are as

follows:

_____

[1]In Petitioner's first direct appeal, the Supreme Court of Florida referred to his co-defendant's direct appeal for the factual and procedural background of the case. *Farina (Anthony) v. State*, 679 So. 2d 1151, 1152-53 (Fla. 1996) ("*Farina I*"), *receded from in part on other grounds*, *Franqui v. State*, 699 So. 2d 1312 (Fla. 1997).  Petitioner's co-defendant was his younger brother, Jeffrey Farina.  Therefore, the facts are taken from the direct appeal of Jeffrey Farina, *Farina (Jeffrey) v. State*, 680 So. 2d 392, 394 (Fla. 1996) ("*J. Farina I*"), and from Petitioner's appeal after re-sentencing. *Farina (Anthony) v. State*, 801 So. 3d 44, 48 (Fla. 2001) ("*Farina II*").

[Jeffrey A. ] Farina and his brother, Anthony J. Farina, were tried together and convicted of fatally shooting seventeen-year-old Michelle Van Ness during the May 1992 robbery of a Taco Bell restaurant in Daytona Beach. Jeffery Farina fired the shot to the head that killed Van Ness.

. . .

Van Ness and the other three victims all worked at Taco Bell. After the restaurant closed early on May 9, 1992, Jeffery and Anthony Farina confronted Van Ness and Derek Mason, 16, while the two employees were emptying trash. Jeffery was armed with a .32-caliber pistol, Anthony carried a knife and rope, and both wore gloves.

The Farinas ordered Van Ness and Mason into the restaurant, where they rounded up two other employees. Jeffery held three employees at gunpoint, while Anthony forced employee Kimberly Gordon, 18, to open the safe and hand over the day's receipts. Although there were assurances that no one would be hurt, the Farinas tied the employees' hands behind their backs and Anthony forced them into a walk-in freezer.

Survivors testified that Van Ness was shaking and crying as she entered the freezer and she was afraid she would be hurt. Shortly after the employees were led to the freezer, Jeffery shot Mason in the mouth. He then shot employee Gary Robinson, 19, in the chest, and finally shot Van Ness in the head. Gordon was stabbed in the back.

The Farinas fled the restaurant, but were arrested later that day after another Taco Bell employee saw Anthony buying gasoline at a service station and called the police. When arrested, Jeffery had a receipt from a local store indicating that he had purchased .32-caliber bullets, gloves, and clothesline on May 8. The Farinas had $1,885 of the $2,158 that was taken from Taco Bell.

Van Ness died on May 10. The Farinas were charged with first-degree murder and six other offenses.

*J. Farina I*, 680 So. 2d at 394.[2] On direct appeal, the Supreme Court of Florida vacated

_____

[2]A third defendant, John Henderson, was charged with the same crimes for his role in planning the crimes and driving the getaway vehicle but was tried separately from Petitioner and his brother. Henderson was convicted as charged and received a life

Petitioner's death sentence and remanded the case for a new penalty phase. *Farina I*, 679 So. 2d at 1153. Following the second penalty phase, the Supreme Court noted the following:

> On remand, a joint penalty proceeding was held before a new jury. By a vote of twelve to zero the jury recommended the death penalty for each defendant. The trial court followed the jury recommendation and sentenced both defendants to death.
>
> In imposing the death penalty on Anthony, the trial judge found five aggravating factors: (1) defendant was previously convicted of another capital felony or felony involving the use or threat of violence based upon the attempted murders of the other restaurant employees; (2) the murder was committed to avoid arrest; (3) the murder was committed for pecuniary gain; (4) the murder was heinous, atrocious, or cruel (HAC); and (5) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP). The judge found three statutory mitigating factors (Anthony had no significant history of prior criminal activity; he was an accomplice in the capital felony committed by Jeffery and his participation was relatively minor; he was eighteen years old at the time of the crime) and fifteen nonstatutory mitigating factors (abused and battered childhood, history of emotional problems, cooperation with the police, involvement in Christianity and Bible study courses while in prison, good conduct in prison, remorse for what happened, assertion of a positive influence on others, no history of violence, abandonment by his father, poor upbringing by his mother, lack of education, good employment history, and amenability to rehabilitation). The trial judge concluded that the aggravating factors far outweighed the mitigating factors, and imposed the death penalty.

*Farina II*, 801 So. 2d at 48-49.

## II.  *Procedural History*

Petitioner was charged by indictment with first degree murder (count one), three

---

sentence for the first degree murder conviction. The Fifth District Court of Appeal affirmed his convictions and sentences *per curiam*. *Henderson v. State*, 653 So. 2d 1044 (Fla. 5th DCA 1995).

counts of attempted first degree murder (counts two, three, and four), armed robbery with a firearm or deadly weapon (count five), burglary of an occupied structure with a battery (count six), four counts of kidnapping (counts seven, eight, nine, and ten), and conspiracy to commit murder and/or armed robbery (count eleven) (Ex. A-16 at 2162-67).[3] Prior to trial, Petitioner moved to sever his trial from his co-defendant's trial. *Id.* at 2245-46. The trial court granted the motion because the State wished to introduce the defendants' separate statements made to police (Ex. A-17 at 2430-31). The trial court found that the State could try the co-defendants together and use only the portions of taped statements made when both defendants were present.[4] *Id.* at 2431. The State elected to try Petitioner and his brother together, and after the jury trial (Ex. A-21 -24), Petitioner was convicted on all counts as charged (Ex. A-18 at 2609-19). The trial judge entered a judgment of acquittal with respect to the kidnapping counts (counts seven, eight, nine, and ten). *Id.* at 2683.

A penalty proceeding was conducted (Ex. A-25 -27), and the jury recommended by a vote of seven to five that the trial court impose the death penalty upon Petitioner (Ex. A-18 at 2639). Thereafter, the trial judge conducted a hearing pursuant to *Spencer v. State*, 615 So. 2d 688 (Fla. 1993), after which it found five aggravating factors, no statutory mitigating factors, and several non-statutory mitigating factors. *Id.* at 2650-55. The trial court

---

[3]References to the record will be made by citing to the particular volume and page of the advanced appendix. For example, "Ex. A at 1" refers to page one of the volume labeled Exhibit A.

[4]The defendants' conversations were recorded while both were sitting together in the back of a police car.

concluded that the aggravating circumstances outweighed any mitigating circumstances and as such, followed the jury's recommendation and sentenced Petitioner to death for the first degree murder conviction. *Id.* The trial court also sentenced Petitioner to six consecutive terms of life imprisonment for the remaining counts.[5] *Id.* at 2674-80.

On direct appeal, Petitioner raised ten claims (Ex. B). The Supreme Court of Florida affirmed Petitioner's convictions and the sentences with respect to the noncapital offenses but vacated Petitioner's death sentence because the trial court erroneously excused for cause a prospective juror who was qualified to serve.[6] *Farina I*, 679 So. 2d at 1153. The Court remanded the case for a new penalty proceeding. *Id.* at 1158. On remand, a joint penalty phase was held before a jury for both Petitioner and Jeffrey (Ex. F-21 - F-28). The jury recommended by a vote of twelve to zero that the trial court impose the death penalty upon Petitioner (Ex. F-3 at 336). The trial judge conducted a *Spencer* hearing (Ex. F-29) and found five aggravating factors, three statutory mitigating factors, and fifteen nonstatutory mitigating factors (Ex. F-3 at 354-61). The trial court concluded that the aggravating circumstances outweighed the mitigating circumstances and accordingly sentenced Petitioner to death.[7] *Id.* at 360. Petitioner appealed and raised twelve claims for relief

---

[5]Jeffrey Farina was also convicted as charged, and the trial court entered a judgment of acquittal as to the kidnapping counts. Furthermore, Jeffrey also received a sentence of death for the first degree murder conviction. *J. Farina I*, 680 So. 2d at 393.

[6]The Supreme Court of Florida also affirmed Jeffrey's convictions and noncapital sentences and vacated his death sentence on the same grounds. *J. Farina I*, 680 So. 2d at 393.

[7]On remand, the jury also recommended a death sentence for Jeffrey's first degree murder conviction, and the trial court imposed a death sentence. *Farina (Jeffrey) v. State*,

(App. G), and the Supreme Court of Florida affirmed Petitioner's death sentence. *Farina II*, 801 So. 2d at 48.

On April 4, 2003, Petitioner filed a motion for post-conviction relief pursuant to Rule 3.851 of the Florida Rules of Criminal Procedure alleging thirteen grounds for relief (Ex. L-2 at 252-326). The trial court held an evidentiary hearing on claims three and twelve (Ex. L-1 at 22-179). After the evidentiary hearing, the trial court denied the Rule 3.851 motion (Ex. L-3 at 478-95). Petitioner appealed, and while his appeal was pending, he filed a petition for writ of habeas corpus (Ex. P). The Supreme Court of Florida affirmed the trial court's denial of Petitioner's Rule 3.851 motion and denied the petition for writ of habeas corpus. *Farina (Anthony) v. State*, 937 So. 2d 612, 616 (Fla. 2006) ("*Farina III*").

Petitioner then filed a second Rule 3.851 motion for post-conviction relief, alleging two grounds for relief (Ex. U at 33-52). The trial court summarily denied relief. *Id.* at 175-78. On appeal, the Supreme Court of Florida affirmed the lower court's order denying relief. *Farina (Anthony) v. State*, 992 So. 2d 819 (Fla. 2008) (unpublished) ("*Farina IV*"). The instant amended federal habeas petition follows.

## III.  *Governing Legal Principles*

Because Petitioner filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996

---

763 So. 2d 302, 302 (Fla. 2000) ("*J. Farina II*"). However, the Supreme Court of Florida vacated the death sentence and imposed a sentence of life imprisonment without the possibility of parole for twenty-five years, finding the imposition of a death sentence for Jeffrey, a minor at the time he committed the offenses, constituted cruel and unusual punishment. *Id.* at 303. (citing *Brennan v. State*, 754 So. 2d 1 (Fla. 1999)).

("AEDPA"). *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); *Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "establishes a more deferential standard of review of state habeas judgments," *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001), in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (recognizing that the federal habeas court's evaluation of state-court rulings is highly deferential and that state-court decisions must be given the benefit of the doubt).

### A.  Standard of Review Under the AEDPA

Pursuant to the AEDPA, habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

    (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see Knowles v. Mirzayance*, 129 S.Ct. 1411, 1412 (2009); *Brown v. Payton*, 544 U.S. 133, 141 (2005). The phrase "clearly established Federal law," encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Schwab v. Crosby*, 451 F.3d 1308, 1324 (11th Cir. 2006) (stating that the federal law relevant to this analysis is the United States Supreme Court precedent "in existence at the time the conviction became final").

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider." *Maharaj v. Sec'y for Dep't. of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005). The meaning of the clauses was discussed by the Eleventh Circuit Court of Appeals in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001):

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

If the federal court concludes that the state court applied federal law incorrectly, habeas relief is appropriate only if that application was "objectively unreasonable." *Id*.

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." A determination of a factual issue made by a state court, however, shall be presumed correct, and the habeas petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

## B.    *Standard for Ineffective Assistance of Counsel*

The United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), established a two-part test for determining whether a convicted person is entitled to relief

on the ground that his counsel rendered ineffective assistance: (1) whether counsel's performance was deficient and "fell below an objective standard of reasonableness"; and (2) whether the deficient performance prejudiced the defense.[8] *Id*. at 687-88. A court must adhere to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*. at 689-90. "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. at 690.

As observed by the Eleventh Circuit Court of Appeals, the test for ineffective assistance of counsel:

> has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. Courts also should at the start presume effectiveness and should always avoid second guessing with the benefit of hindsight. *Strickland* encourages reviewing courts to allow lawyers broad discretion to represent their clients by pursuing their own strategy. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992) (citation omitted). Under those rules and presumptions, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

---

[8]In *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), the United States Supreme Court clarified that the prejudice prong of the test does not focus solely on mere outcome determination; rather, to establish prejudice, a criminal defendant must show that counsel's deficient representation rendered the result of the trial fundamentally unfair or unreliable.

Additionally, it is well established that a defendant has the right to effective counsel on appeal. *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984). The Eleventh Circuit Court of Appeals has applied the United States Supreme Court's test for ineffective assistance at trial to guide its analysis of ineffective assistance of appellate counsel claims. *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991); *Matire v. Wainwright*, 811 F.2d 1430, 1435 (11th Cir. 1987). Thus, in order to establish ineffective assistance of appellate counsel, Petitioner must show (1) that counsel's performance was deficient and "fell below an objective standard of reasonableness" and (2) that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687-88.

### C. Exhaustion and Procedural Default

One procedural requirement set forth in the AEDPA precludes federal courts, absent exceptional circumstances, from granting habeas relief unless the petitioner has exhausted all means of available relief under state law. 28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-22 (1999); *Picard v. Connor*, 404 U.S. 270, 275 (1971). Specifically, the AEDPA provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
>
> (A)  the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)  (I)  there is an absence of available State corrective process; or
>
>      (ii)  circumstances exist that render such process ineffective

to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

Thus, a federal court must dismiss those claims or portions of claims that have been denied on adequate and independent procedural grounds under state law. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In addition, a federal habeas court is precluded from considering claims that are not exhausted but would clearly be barred if returned to state court. *Id*. at 735 n.1 (stating that if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, there is a procedural default for federal habeas purposes regardless of the decision of the last state court to which the petitioner actually presented his claims).

In order to satisfy the exhaustion requirement, a state petitioner must "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (citing *Picard*, 404 U.S. at 275-76) (internal quotation marks omitted). The petitioner must apprise the state court of the federal constitutional issue, not just the underlying facts of the claim or a similar state law claim. *Snowden v. Singletary*, 135 F.3d 732 (11th Cir. 1998). The United States Supreme Court has observed that "Congress surely meant that exhaustion be serious and meaningful." *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 10 (1992). Furthermore, the Court explained:

[c]omity concerns dictate that the requirement of exhaustion is not satisfied

by the mere statement of a federal claim in state court. Just as the State must afford the petitioner a full and fair hearing on his federal claim, so must the petitioner afford the State a full and fair opportunity to address and resolve the claims on the merits.

*Id.*; *see also Henderson*, 353 F.3d at 898 n.25 ("Both the legal theory and the facts on which the federal claim rests must be substantially the same for it to be the substantial equivalent of the properly exhausted claim.").

Procedural default will be excused only in two narrow circumstances. First, a petitioner may obtain federal review of a procedurally defaulted claim if he can show both "cause" for the default and actual "prejudice" resulting from the default. "To establish 'cause' for procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). To establish "prejudice," a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different. *Henderson*, 353 F.3d at 892 (citations omitted).

The second exception, known as the "fundamental miscarriage of justice," only occurs in an extraordinary case, in which a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Actual innocence means factual innocence, not legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998). To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). In addition, "'[t]o be credible,' a claim of

actual innocence must be based on [new] reliable evidence not presented at trial." *Calderon*

*v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup*, 513 U.S. at 324).

## IV.    *Analysis*[9]

Upon careful review of the record and, for the reasons set forth below, the Court

concludes no evidentiary proceedings are required in this Court. *Schriro v. Landrigan*, 550

U.S. 465, 474, 127 S.Ct. 1933, 1939-40 (2007). Petitioner does not proffer any evidence that

would require an evidentiary hearing, *San Martin v. McNeil*, 66 F.3d 1257, 1271 (11th Cir.

2011), and the Court finds that the pertinent facts of the case are fully developed in the

record before the Court. *Schriro*, 550 U.S. at 474; *Turner v. Crosby*, 339 F.3d 1247, 1272 (11th

Cir. 2003), *cert. denied*, 541 U.S. 1034(2004)

### A.    *Claim One*

Petitioner claims that his Sixth and Fourteenth Amendment rights were violated

when biased and partial jurors were seated on his guilt phase jury (Doc. No. 49 at 8).

Petitioner specifically contends that he was required to exhaust seven peremptory

challenges on jurors who should have been excluded for cause. *Id.* After Petitioner

exhausted his peremptory challenges, he requested additional peremptory challenges but

the trial court denied the request, which Petitioner contends resulted in the seating of

several jurors who were biased. *Id.* at 11-12. Petitioner raised this claim on direct appeal

and the Supreme Court of Florida denied the claim, finding that the jurors about whom

_____

[9]In his memorandum of law, Petitioner states that he is withdrawing claims four, five, and seven (Doc. No. 56 at 11, 23). Thus, the Court will not address those claims.

Petitioner complained all stated that they could base their decisions on the evidence, thus the trial court did not abuse its discretion in refusing to excuse the jurors for cause. *Farina I*, 679 So. 2d at 1153. Moreover, the court concluded that the trial court did not err in refusing to grant additional peremptory challenges. *Id.*

The Sixth Amendment provides that a criminal defendant has the right to an impartial jury. *Berghuis v. Smith*, 130 S. Ct. 1382, 1387 (2010); *Morgan v. Illinois*, 504 U.S. 729, 730 (1992). "Voir dire examination serves the dual purposes of enabling [a] court to select an impartial jury and assisting counsel in exercising peremptory challenges." *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991).

First, Petitioner claims that the trial court erred in failing to grant cause challenges for prospective jurors Wasko, Graham, Daniel, Domeij, Wagoner, Johnson, and Jeffers. The standard for determining when a prospective juror may be excluded from a capital punishment case for cause is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Uttecht v. Brown*, 551 U.S. 1, 7 (2007) (quoting *Wainwright v. Witt*, 469 U.S. 414, 424 (1985)). A trial court's determination with respect to whether a venire member should or should not be struck for cause is entitled to deference because "such a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." *Wainright*, 469 U.S. at 428; *see also Uttecht*, 551 U.S. at 9 ("Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and

14

qualifications of potential jurors.").

Petitioner has not demonstrated that the trial court erred in failing to excuse any of the above jurors for cause. Juror Wasko stated that she would have to hear all of the facts of the case before determining the defendants' guilt (Ex. A-8 at 1060). Wasko also stated that she did not believe that the death penalty automatically applied in every case of premeditated first degree murder. *Id.* at 1063. Although Wasko had heard about the instant crime through the news media, she had not formed any opinions with regard to the case. *Id.* at 1073, 1116. Wasko stated she was starting with a "clean slate" and would consider only the evidence at trial (Ex. A-9 at 1202).

Moreover, prospective juror Graham stated that imposition of the death penalty depended on the specific facts of the case. *Id.* at 1275. Graham told the court that she had been exposed to news regarding the case but did not learn anything about the proceedings or evidence in the case, nor had anything influenced her about the case (Ex. A-11 at 1475). Graham unequivocally stated that she could be fair and impartial. *Id.* at 1476. While Graham stated that she expected the defense to present evidence to overcome the information disseminated by the news media, upon further questioning, Graham stated that she viewed the defendants as innocent until proven guilty. *Id.* at 1479. Additionally, Graham stated that she would base her verdict only on the evidence presented at trial. *Id.*

Prospective juror Daniel at first stated that she did not believe that she could be fair or impartial in this case (Ex. A-9 at 1339). However, Daniel was rehabilitated when she stated that she could set aside any feelings she had and base her verdict on what she heard

in the courtroom. *Id.* at 1340. Daniel also stated that she would follow the trial court's instructions and would listen to all of the evidence presented. *Id.* at 1348, 1360.

Prospective juror Domeij stated that any pretrial publicity he had been exposed to would not affect his ability to be fair and impartial (Ex. A-11 at 1612). Moreover, although Domeij stated that he had strong feelings in favor of the death penalty, he would listen to and consider all evidence presented prior to making a decision. *Id.* at 1615-16. Although Domeij stated that given his strong views, he might find that death was the only possible sentence in a first degree murder case, the trial court noted that Domeij was never asked whether he could follow the law. *Id.* at 1620, 1624. The trial court denied the cause challenge as premature, and counsel elected to exercise a peremptory challenge. *Id.* at 1624-25.

Prospective juror Wagoner noted that he had not been exposed to any pretrial publicity that had prejudiced him to the point that he could not give the defendants a fair trial (Ex. A-13 at 1796). Wagoner also stated that he presumed the defendants innocent and would consider any factors allowed by the judge in determining a penalty. *Id.* at 1798. Although Wagoner also stated that he would not consider mercy with respect to the penalty phase, the trial court denied the cause challenge because Wagoner stated that he would be fair and follow instructions. *Id.* at 1813.

Furthermore, prospective juror Johnson stated that she would base her verdict only on the evidence presented during trial (Ex. A-14 at 1886). Johnson stated she would consider mitigating factors during the penalty phase, such as childhood abuse, one's

background, and mercy.  *Id.* at 1890.  Johnson stated that while she was in favor of the

death penalty, she would weigh the aggravators and mitigators if there was a penalty

phase.  *Id.* at 1899.  Johnson did not automatically think the defendants were guilty due to

her exposure to the news about this case.  *Id.* at 1929.

Finally, prospective juror Jeffers stated that he presumed the defendants' innocent.

*Id.* at 1905.  While Jeffers stated that he would not consider such things as child abuse and

mercy in determining a penalty, Jeffers also stated that he would listen to the facts of the

case before determining what penalty was appropriate.  *Id.* at 1906-09. Jeffers also was not

asked whether he could follow the court's instructions.  Moreover, although Jeffers stated

that if you take a life you should give up a life, Jeffers also indicated that he could be fair

in this case.  *Id.* at 1911, 1918.

The Court finds that the state court's refusal to exclude these jurors for cause does

not run afoul of the standards set forth in *Uttecht* and *Witt.*  Each juror stated that they

could be fair and that they would base their decisions on the evidence presented and not

what they had heard prior to voir dire.  Furthermore, Petitioner has presented no evidence

to overcome the presumption of correctness afforded the state court's determination of

these jurors' impartiality.  The state court's findings were not unreasonable.  *See* 28 U.S.C.

§§ 2254(d)(2), (e)(1); *Callahan v. Campbell*, 427 F.3d 897, 926 (11th Cir.2005) ("[Section]

2254(d)(2) allows for relief where the state court adjudication 'resulted in a decision that

was based on an unreasonable determination of the facts in light of the evidence presented

in the State court proceeding.' § 2254(d)(2).  Not only must the factual determination have

been unreasonable, but the state court's factual findings must be shown unreasonable by clear and convincing evidence."). Because the trial court did not err in denying the cause challenges for these jurors, Petitioner was not improperly forced to use his peremptory challenges on the jurors which allegedly led to the seating of other jurors that he deemed objectionable. The Court also notes that "[p]eremptory challenges are not of constitutional dimension", therefore, the trial court did not err in denying Petitioner additional peremptory challenges. *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988). As such, this claim is denied pursuant to § 2254(d).

To the extent that Petitioner also alleges that the trial court erred in denying his cause challenges to jurors Nice, Marley, Marriott, Stewart, and Sullivan, the Court finds that Petitioner has not demonstrated that he is entitled to relief. Although prospective juror Nice first stated that he would give the defendants a fair trial "[i]f they deserve one," Nice later was rehabilitated when he stated that he would consider all of the evidence and instructions, could be fair and impartial, and presumed the defendants innocent (Ex. A-14 at 1955-60). Prospective juror Marley stated that she could set aside any news reports she heard about the case and could base her verdict solely on the evidence and the trial judge's instructions (Ex. A-15 at 1998, 2000). Marley also felt that whether a sentence of death was warranted was dependant upon the particular circumstances of the case. *Id.* at 2011. Prospective juror Marriott stated that he would base his decision on the evidence he heard. *Id.* at 2021-22. Marley, Marriott, and prospective juror Stewart each stated that they believed a crime had been committed, but none were of the opinion that defendants were

guilty. *Id.* at 2026, 2043, 2053, 2063. It was not error for the trial court to deny cause

challenges on this ground because a crime had been committed, as a victim had been shot

and killed. The jurors did not express opinions as to whether the crime was murder and

to what degree, or that they had an opinion as to who committed the crime.

Finally, prospective juror Sullivan stated that she presumed the defendants were

innocent, would not automatically vote for the death penalty, and had not formed an

opinion as to the case (Ex. A-11 at 1598-1602). Petitioner has not demonstrated that the trial

court erred by denying his cause challenge with respect to this juror. Because each juror

stated that they could be fair and impartial, Petitioner has not demonstrated that any of the

jurors were biased or impartial. "Prospective jurors are presumed impartial; the challenger

to that presumption bears the burden of proving bias, and a conclusory statement that the

jurors were biased is insufficient. To maintain a claim that a biased juror prejudiced him,

a petitioner must show that the juror was actually biased against him." *Diaz v. Sec'y for*

*Dep't of Corr.*, No. 00-cv-4815, 2006 WL 3469522, at *4 (S.D. Fla. Sept. 18, 2006) (citing *Smith*

*v. Phillips*, 455 U.S. 209 (1982)); *Souza v. Sec'y for Dep't of Corr.*, No. 6:07-cv-22, 2008 WL

4826096, at *7 (M.D. Fla. Nov. 4, 2008). Petitioner has not met his burden of demonstrating

the jurors' bias against him, and as such, this claim is denied pursuant to § 2254(d).

### B.    *Claim Two*

Petitioner alleges that he was denied a fair trial in violation of his Fifth, Sixth, and

Fourteenth Amendments where the trial court restricted voir dire so as to prevent him from

unveiling grounds for cause challenges and from developing information to assist him in

intelligently exercising his peremptory challenges (Doc. No. 49 at 15). Petitioner contends

that the trial court would not allow him to question jurors regarding whether they would

impose the death penalty in every case where premeditated murder was proven. *Id.*

Additionally, Petitioner asserts that the trial court would not allow him to ask questions

regarding jurors' views on mitigating factors and regarding whether they had been

exposed to news reports that would make them believe Petitioner was guilty. *Id.* at 15-18.


This claim was raised on direct appeal, and the Supreme Court of Florida rejected

the claim. *Farina I*, 679 So. 2d at 1154. The court noted the following:

> Defense counsel tried on many occasions to solicit prospective jurors' personal opinions. The defense was allowed to ask questions such as "If the judge instructs you that age is a factor you should consider in reaching the determination of the applicability of the death penalty would you agree with that?" The court did sustain the State's objections to questions about personal opinions such as, "Now, aside from following the instructions of the court, is that something you think is good or bad, in your personal opinion?"

> While it is true that defense counsel was restricted from exploring jurors' attitudes on every potential mitigator, the record shows that the defense, the State, and the trial court either asked or instructed prospective jurors on numerous occasions whether they could be fair to Farina and his brother. Thus, we find no merit to this issue.

*Id.*

The purpose of voir dire is to determine whether prospective jurors can render an

impartial verdict based solely on the evidence and the court's instructions. *Rosales-Lopez*

*v. United States*, 451 U.S. 182, 188 (1981). A petitioner is entitled to ask prospective jurors

in a death penalty case questions regarding the death penalty to determine whether their

views would disqualify them from sitting. *Morgan v. Illinois*, 504 U.S. 719, 731 (1992) (citing *Witherspoon v. Illinois*, 391 U.S. 510 (1968)). The Constitution "does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury." *Id.* at 729. Neither due process nor the Sixth Amendment entitles a defendant to ask prospective jurors every question that might prove helpful. *Mu'Min*, 500 U.S. at 425-26. The inability to ask certain questions must render the proceeding fundamentally unfair by making it impossible to identify an unqualified juror. *Id.* at 426.

The record clearly supports the Florida Supreme Court's findings. Voir dire took place over the course of five days and the transcript spans over 1200 pages (Ex. A-8 - A-15). Although the trial court did not allow questions regarding every potential mitigator that could be raised in the case and sustained objections regarding some questions relating to jurors' personal views as to mitigators, the trial court did allow defense counsel to ask the jurors generally about whether they would consider age and personal background, such as a history of abuse, in determining the penalty. Defense counsel also asked the potential jurors whether they would automatically vote for the death penalty. Moreover, the trial court allowed the defense attorneys individual voir dire on every juror not initially stricken to determine whether they had been prejudicially exposed to pretrial publicity. Each prospective juror was asked numerous times whether they could be fair and impartial, whether they had formed a fixed opinion about the case due to exposure to pretrial publicity, what their feelings regarding the death penalty were, and whether they would consider mitigating factors.

In viewing the record as a whole, it appears that defense counsel was allowed to ask questions that would enable counsel to determine whether to challenge a juror for cause or whether a peremptory challenge was necessary. Petitioner has not cited to any precedent from the Supreme Court of the United States in which the Court found that a minor limitation on voir dire, such as a trial court's failure to allow a defendant to question every individual juror regarding whether they would impose the death penalty in every case where premeditated murder was proven violates a defendant's due process rights. There is no indication that the trial court's limitation on voir dire in the instant case rendered the entire jury selection process fundamentally unfair. Petitioner has not demonstrated that the state court's determination of this claim was contrary to, or resulted in an unreasonable application of, clearly established federal law. As such, claim two is denied pursuant to § 2254(d).

### C.    *Claim Three*

In his third ground for relief, Petitioner alleges that the trial court erred in denying his repeated motions for change of venue (Doc. No. 49 at 20).[10] Petitioner maintains that

---

[10]To the extent Petitioner argues that because the trial was held in the DeLand, Florida courthouse instead of the Daytona Beach, Florida courthouse he received a different jury pool (Doc. No. 56 at 6-7), the Court notes that both DeLand and Daytona Beach are a part of Volusia County. In Florida, jury pools are selected by lists received from the Department of Highway Safety and Motor Vehicles. Fla. Stat. § 40.011. The Department delivers lists to the clerk of the circuit court in each county that contain the names of people who reside in that county, are citizens of the United States, legal residents of the State of Florida, who are 18 years old or older, and for whom the Department has a driver's license or identification card record. *Id.* Therefore, the jury pool was the same regardless of whether the trial was held in DeLand or Daytona Beach. Furthermore, it appears that voir dire and trial actually occurred in Daytona Beach, Florida, as that is the

the trial court's denial of his motion for a change of venue resulted in him being tried in a community that was hostile and prejudiced against him. *Id.* Petitioner raised this claim on direct appeal and the Supreme Court of Florida rejected the claim, finding that the "fact that jurors were exposed to pretrial publicity, however, is not enough to raise the presumption of unfairness." *Farina I*, 679 So. 2d at 1154. The court found that although most of the potential jurors had heard about the instant case, all of the jurors "ultimately chosen indicated that they could base their verdicts on the evidence presented." *Id.*

A criminal defendant has the right to a fair trial by a panel of impartial, indifferent jurors pursuant to the Sixth Amendment. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). However, it is not required that "the jurors be totally ignorant of the facts and issues involved" in the trial. *Id.* The Supreme Court of the United States has held that it is "sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 723 (citations omitted). If a trial court cannot seat an impartial jury "because of prejudicial pretrial publicity or an inflamed community atmosphere", then "due process requires the trial court to grant [a] defendant's motion for a change of venue." *Coleman v. Kemp*, 778 F.2d 1487, 1489 (11th Cir. 1985) (citations omitted).

A defendant is entitled to a change of venue if he can demonstrate "actual prejudice." *Meeks v. Moore*, 216 F.3d 951, 961 (11th Cir. 2000) (citing *Coleman*, 708 F.3d at 544). To establish actual prejudice, a criminal defendant must show: (1) that one or more jurors who decided the case entertained an opinion, prior to hearing the evidence at trial,

location referenced on the transcripts from voir dire (Ex. A-8).

that the defendant was guilty and (2) the juror could not have laid aside his or her preformed opinions and rendered a verdict based on the evidence. *Id.* Additionally, if pretrial publicity "is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community" then prejudice is presumed. *Coleman*, 778 F.2d at 1490 (citing *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963); *Murphy v. Florida*, 421 U.S. 794, 798-99 (1975)). A presumption of prejudice is reserved only for the "extreme" situation. *Id.*

Petitioner argues that there was extensive pretrial publicity in this case and cites to thirty-nine articles that appeared in print prior to trial. Every potential juror was asked about whether they had previously heard or read a news report regarding the instant case. Moreover, every juror was asked whether they could be fair and impartial despite having heard news regarding this case. Although a majority of jurors had been exposed to some pretrial publicity, the trial court excused every juror for cause who initially stated that they had been exposed to an overwhelming amount of publicity and could not be fair. *See* Ex. A-8 at 1027, 1033, 1037, 1153, 1155, 1158, 1160; Ex. A-9 at 1234-37, 1302, 1332, 1338, Ex. A-11 at 1530, 1531, 1556, 1585, 1608; Ex. A-12 at 1638; Ex. A-13 at 1714, 1774, 1794, 1812, 1823; Ex. A-14 at 1884, 1954; Ex. A-15 at 2019. The state trial court granted approximately 40 or more cause challenges on venire members due to exposure to pretrial publicity. Moreover, the trial court allowed individual voir dire on every juror not initially stricken for cause outside the presence of the other venire members wherein defense counsel was allowed to ask each potential juror about the extent of the media exposure with regard to this case and whether they could be fair in light of their prior exposure to this case. All of the jurors seated, if

exposed to articles or news programs, stated that they would be fair and impartial and would consider only the evidence presented at trial. There is no indication that one or more jurors that sat on the jury entertained an opinion that Petitioner was guilty, nor did any of the jurors communicate that they could not lay aside any preformed opinions.

In *Rideau*, the Supreme Court of the United States presumed prejudice where the defendant's confession to a bank robbery, kidnapping of three employees, and subsequent murder of one employee was videotaped and broadcast on the local news on three separate occasions. 373 U.S. at 724. The Court found that the trial court's denial of the defendant's motion for change of venue violated due process because the televised confession amounted to Rideau's trial and "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." *Id.* at 726. Although there was an allegation in the instant case that at least one article or news program mentioned the possibility of a confession or statement made by defendants, there have been no allegations that any statements made by Petitioner were played in their entirety on the news or were printed in the newspaper. Moreover, only one juror noted that he had heard that the defendants had purportedly confessed to the crimes. Potential juror Abdalian noted this during his individual voir dire and was immediately discharged (Ex. A-13 at 1712-14). Accordingly, this Court will not presume prejudice in the instant case.

In *Irvin*, the Supreme Court noted that the pretrial publicity consisted of "a barrage of newspaper headlines, articles, cartoons and pictures [that]was unleashed against him

during the six or seven months preceding his trial." 366 U.S. at 725. The articles revealed details of the petitioner's background, references to juvenile crimes he had committed, previous adult convictions, military background, accusations of violating parole, and information that he failed a lie detector test, among other information. *Id.* The Court found that a "pattern of deep and bitter prejudice" was shown through the community. *Id.* at 727 (quotation omitted). The Court noted that 8 out of the 12 seated jurors thought that petitioner was guilty, and stated "[w]ith such an opinion permeating their minds, it would be difficult to say that each could exclude this preconception of guilt from his deliberations." *Id.* (citation omitted). The Court vacated the judgment of the appellate court and remanded the case for a new trial. *Id.* at 728-29. Unlike *Irvin*, in the instant case none of the seated jurors expressed the opinion that Petitioner was guilty or that the pretrial publicity would affect their ability to be impartial.

In *Patton v. Yount*, 467 U.S. 1025, 1032 (1984), the Supreme Court found that while "the extensive adverse publicity and the community's sense of outrage were at their height prior to Yount's first trial," the jury selection for Yount's second trial did not occur until four years later, at which time the prejudicial publicity "was greatly diminished and community sentiment had softened." *Id.* The Court held that the trial court did not commit manifest error in refusing to change the venue of the second trial and in finding that the jury as a whole was impartial. *Id.* The Court noted that the relevant question was not whether "the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant." *Id.* at 1035 (citing

*Irvin*, 366 U.S. at 723).  Similar to *Yount*, here the jurors that were seated did not have such fixed opinions that they could not impartially judge the case.  All of the jurors who stated they could not presume Petitioner innocent or who thought they could not be fair or impartial were stricken for cause.

Because Petitioner has not demonstrated actual prejudice, he cannot show that the trial court's denial of his motion to change venue was in error.  The state court's determination of this claim was not contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States.  Accordingly, claim three is denied pursuant to § 2254(d).

### D.    Claim Six

Petitioner claims that the trial court erred in permitting the State to strike two African American jurors during voir dire prior to the second penalty phase proceeding (Doc. No. 49 at 38).[11]  Petitioner argues that the State's striking of these jurors violated *Batson v. Kentucky*, 476 U.S. 79 (1986) and its progeny.  *Id.*  Petitioner specifically takes issue with the State's use of peremptory challenges to strike jurors Edwards and Hilton.  *Id.* at 38-43.  Petitioner states that although the State challenged juror Edwards due to the fact that she had a son in prison, there were other jurors who had family members in prison who were not stricken.  Moreover, Petitioner contends that while juror Hilton was

_____

[11]Petitioner can raise this claim despite the fact that he is not African-American.  *See Powers v. Ohio*, 499 U.S. 400, 415 (1991) (noting that if the Court barred a claim because the petitioner was not of the same race as the excluded jurors, it would be condoning the arbitrary exclusion of citizens from jury service); *Walls v. Buss*, 658 F.3d 1274 (11th Cir. 2011).

challenged because of her religious nature, Petitioner states that other jurors were also religious and were allowed to remain on the jury.[12]

Petitioner raised this claim on appeal from resentencing, and the Supreme Court of Florida rejected the claim. *Farina II*, 801 So. 2d at 49-50. The court noted that Edwards was struck by the State due to her concern over her son's drug conviction and her hesitancy regarding the death penalty. *Id.* at 50. Additionally, the court stated that Hilton was struck on the grounds that she was thirty minutes late to voir dire, was only tentative in supporting the death penalty, and was a member of a church that was involved in a prison ministry program. *Id.* The court concluded that the trial court's findings that the State had provided genuine race-neutral reasons for striking the jurors was not clearly erroneous. *Id.*

"Although a prosecutor ordinarily is entitled to exercise permitted peremptory challenges 'for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried, . . . the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black

---

[12]To the extent that Respondents argue that a portion of Ground Six is unexhausted, the Court disagrees. Respondents assert that Petitioner failed to make comparison arguments in the state courts between the stricken jurors and other non-stricken jurors who also had family members in prison or were religious but were not challenged by the State. In *Miller-El v. Dretke*, 545 U.S. 231, 241 n. 2 (2005), the Supreme Court of the United States found the petitioner's new arguments and comparisons regarding the questioning of black and white venire panelists were exhausted in the state court because the transcript of voir dire was before the state court. Similar to *Miller-El*, in the instant case, the voir dire transcript was before the state courts, therefore, the comparisons between the stricken African-American jurors and non-stricken white jurors could have been previously considered.

jurors as a group will be unable to impartially consider the State's case against a black defendant." *Batson*, 476 U.S. at 89 (internal citations omitted). As such, the Court established the following three-step test for evaluating claims of race or gender discrimination in jury selection:

> The defendant must first establish a prima facie case by producing evidence sufficient to support the inference that the prosecutor exercised peremptory challenges on the basis of race. *Johnson v. California*, 545 U.S. 162 (2005). The burden then shifts to the State to rebut the defendant's prima facie case by offering race-neutral explanations for its challenges. *Batson*, 476 U.S. at 97. The State's proffered explanation at this stage need not be "persuasive or even plausible . . . the issue is the facial validity of the prosecutor's explanation." *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (internal quotation omitted).

> If both sides carry their burdens, it is left to the court to determine whether the defendant has proven purposeful discrimination. *Batson*, 476 U.S. at 98. At this point, "the decisive question will be whether counsel's race-neutral explanation . . . should be believed." *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (plurality opinion). This is a "pure issue of fact, subject to review under a deferential standard . . . [and] peculiarly within a trial judge's province." *Id.* at 364-65 (internal quotation omitted).

*McNair v. Campbell*, 416 F.3d 1291, 1310 (11th Cir. 2005).

During voir dire, potential juror Edwards testified that her son had a drug-related charge in North Carolina four or five years prior to Petitioner's case (Ex. F-14 at 75). Edwards stated that the outcome of her son's trial was reasonable. *Id.* Edwards also noted that she had no religious, moral, conscientious, or other objections to the death penalty. *Id.* at 120. Edwards stated she could follow the court's instructions and would listen to and consider all matters presented regarding mitigation and aggravation. *Id.* at 120-21. Edwards also stated that she has not formed a conclusion about the death penalty one way

or the other (Ex. F-15 at 214-15).  Later during voir dire, the following exchange occurred

between the prosecutor and Edwards:

> Mr. Tanner: Thank you.  Ms. Edwards, I certainly don't want to embarrass you, but I would like to ask you just a question or two.  You indicated your son had some troubles years ago.  Can you tell us what his current status is? Has he come through those? Is he serving time somewhere?
>
> Ms. Edwards: He's in a camp.
>
> Mr. Tanner: In a camp?
>
> Ms. Edwards: Yes.
>
> Mr. Tanner: Is this a prison camp?
>
> Ms. Edwards: I just know he's in Seminole Johnson Camp.  I mean, he was with a group of guys that were supposed to be selling.  They never caught them at anything, because he was there with them, as far as I know, they all went to a camp.
>
> Mr. Tanner: Okay.  They convicted them of selling dope or drugs?
>
> Ms. Edwards: Yes.

(Ex. F-16 at 332-33).

The prosecutor moved to strike Edwards for cause, arguing that the juror was

impartial against the State because she thought her son was not guilty (Ex. F-20 at 1102-03).

The trial court denied the challenge.  *Id.* at 1103.  The prosecutor then used a peremptory

strike on juror Edwards.  *Id.* at 1104.  The prosecutor argued the grounds he stated in his

cause challenge and added that the juror was hesitant to impose the death penalty.  *Id.*

Defense counsel asserted that the State did not give sufficient race-neutral grounds to challenge the juror. *Id.* The trial court found that the State's reasons were adequate and sustained the peremptory challenge. *Id.* at 1106.

Petitioner has not demonstrated that he is entitled to relief with respect to juror Edwards. The State gave a race-neutral reason for its peremptory strike, namely, that it was arguable that Edwards felt her son was wrongfully prosecuted and therefore might be biased against the State. There is no indication that the State was purposefully discriminating by exercising the peremptory strike against juror Edwards. However, Petitioner argues that other prospective jurors, such as juror Ogara, had family members who were accused and convicted of a crime and were not stricken from the jury.[13] In *Miller-El*, the Court stated that a court must consider the entire voir dire to determine if a prosecutor's reasons for striking a juror are implausible. 545 U.S. at 252. The Court stated that the trial court may compare the State's peremptory strike with the treatment of other venire members who expressed similar views to determine whether race was significant in determining who was challenged and who was not. *Id.*

During voir dire, prospective juror Ogara told the court that her nephew had been accused of killing his father (Ex. F-14 at 69). Ogara stated that the crime occurred about

---

[13]Petitioner argues in his amended petition that prospective jurors Silvernail, Linville, Akeney, Weisz, Downer, Bauer, Leroux, Stellitano, Nickell, and Rizvan also had family members accused of crimes (Doc. No. 49 at 43). However, none of these jurors were seated on Petitioner's jury. Silvernail, Linville and Downer were excused for cause, Ankeny and Weisz were excused after the exercise of peremptory challenges, and the remaining jurors were not needed for the jury as the State and Petitioner had accepted twelve jurors and two alternates before reaching Bauer, Stellitano, Nickell, and Rizvan.

twenty years prior in New York. *Id.* Ogara stated that the case was handled properly and her nephew served time in a youth prison. *Id.* at 69-70. Ogara felt that the legal system functioned as it should have and that the case was handled in an appropriate way. *Id.* at 70. Unlike Ogara's statements to the court, Edwards statements could be read as meaning that she believed her son and his friends were wrongfully prosecuted for selling drugs because they were never caught with drugs. Contrary to Edwards' statements, Ogara did not waiver in her statement that her nephew's case was properly handled. Ogara did not allege in any way that she thought her nephew was wrongfully prosecuted. In comparing the State's treatment of these two jurors, the Court finds that the prosecutor's reasons for striking Edwards were plausible. There is no indication that the State treated Edwards differently on account of her race. The Court defers to the state court's finding that the State's race-neutral reason for striking juror Edwards was sufficient.

Additionally, with respect to prospective juror Hilton, it was noted that she was an active member of the Hope Baptist Church in Holly Hill, Florida. *Id.* at 764. Hilton's church was involved in prison ministry, and she stated that the church held Bible classes at the county jail. *Id.* Hilton had not participated in the prison ministry program but had spoken to her sister about her participation. *Id.* at 765. Hilton believed that the program was worthwhile. *Id.* Moreover, Hilton thought that counseling and rehabilitation were important. *Id.* at 767. The State then further questioned Hilton regarding her religion and whether a religious person should have their punishment erased under state law. *Id.* at 777. Hilton stated that even if God forgives a person for his sins, that person still would

have to be punished pursuant to man's law. *Id.*

The State moved to strike Hilton for cause, arguing that she was thirty or forty-five minutes late for voir dire, possibly due to her oversleeping (Ex. F-20 at 1122). The prosecutor also asserted that Hilton was tentative about the death penalty because she belonged to a church that was active in prison ministry. *Id.* at 1122-23. The trial court denied the cause challenge because Hilton indicated that she could follow the law. *Id.* at 1124. The prosecutor then used a peremptory challenge on Hilton for the arguments he previously made. *Id.* Defense counsel argued that the State had not given a valid race-neutral reason for the challenge. *Id.* at 1125. The trial court found that the reasons the prosecutor had given were made in good faith and were not pretextual. *Id.* at 1126.

The Court agrees the State gave a sufficient race-neutral reason for its challenge of Hilton. Hilton indicated that her sister was involved in prison ministry and felt that such programs were important and worthwhile, thus indicating that she might be biased in favor of the defense. Moreover, the State's argument that Hilton was thirty or forty-five minutes late due to oversleeping, indicating that she did not take jury duty seriously and could be late in the future, are also well-taken. There is no indication that the State was purposefully discriminating with respect to this juror.

Additionally, Petitioner argues that two other jurors, Grimes and Bell, were also religious and involved in their church but were not stricken, thus indicating that the State's reasons for striking Hilton were implausible. The Court first notes that juror Grimes was not a member of Petitioner's jury and was stricken by defense counsel (Ex. F-20 at 1110).

Furthermore, although prospective juror Bell was involved in her church and had been involved in prison ministry, Bell stated she only volunteered once with the prison ministry and felt that it was not the type of activity that she wanted to be involved with, thereby indicating that she did not feel prison ministry was a worthwhile activity (Ex. F-19 at 954). Bell further stated that she would follow the court's instructions, would consider all mitigation evidence, and would apply the law and reach a sentence. *Id.* at 983. Bell was not late to jury duty. While the State did not move to strike Bell, and Bell was in fact seated as an alternate, the Court cannot find that the State's disparate treatment of Bell and Hilton is a result of discrimination. Bell's answers indicate that she was less sympathetic toward prisoners, whereas Hilton's answers could be viewed as being sympathetic to the defense. Moreover, as the Court noted, Hilton's late arrival was viewed by the State as a potential pitfall, because if she were late again she would cost the court time and money. The State's reasons for striking juror Hilton, in the context of the entire voir dire proceeding, were not implausible and therefore the Court defers to the state court's finding that the State's race-neutral reasons were sufficient.

Petitioner has not demonstrated that the State engaged in purposeful discrimination in this case. The state court's rejection of this claim was neither contrary to, or an unreasonable application of, clearly established federal law. As such, claim six is denied pursuant to § 2254(d).

### E.     *Claim Eight*

Petitioner claims that the trial court erred in denying his motion to exclude victim

impact evidence during his second penalty phase (Doc. No. 49 at 47). Petitioner maintains that the court's ruling allowed highly emotional and unduly prejudicial evidence to become a feature of the penalty phase. *Id.* Moreover, Petitioner asserts that the trial court's admission of this evidence and its failure to instruct the jury with regard to this evidence violated his Fifth, Sixth, Eight, and Fourteenth Amendment rights. *Id.*

Petitioner raised this claim on direct appeal after the conclusion of his second penalty phase, wherein he was re-sentenced to death (App. G). The Supreme Court of Florida rejected the instant claim, first finding that victim impact evidence is admissible during a capital felony sentencing hearing. *Farina II*, 801 So. 2d at 52. The court also held that the victim impact evidence admitted during Petitioner's second penalty phase hearing did not become a central feature of the sentencing proceeding, nor was it so unduly prejudicial that it rendered the hearing fundamentally unfair. *Id.* at 53 (citing *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)). In concluding that Petitioner was not entitled to relief on this claim, the court noted that the jury did not improperly consider the victim impact evidence because the jury was instructed that the evidence could not be considered as an aggravating circumstance and was only to be considered "insofar as it demonstrates [Van Ness's] uniqueness as an individual human being and the result of loss to the community and its members by her death." *Id.*

Section 921.141(7) of the Florida Statutes provides the following:

Once the prosecution has provided evidence of the existence of one or more aggravating circumstances as described in subsection (5), the prosecution may introduce, and subsequently argue, victim impact evidence to the jury.

> Such evidence shall be designed to demonstrate the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death. Characterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as a part of victim impact evidence.

Prior to the commencement of Petitioner's second penalty phase hearing, co-defendant Jeffrey filed an "Objection to 'Victim Impact Evidence' and Motion to Declare Section 921.141(7), Florida Statutes, Unconstitutional" (Ex. F-1 at 137-38).[14] The State filed an objection to this motion and also moved to proffer the victim impact evidence it intended to admit at the penalty phase. *Id.* at 158-60. The trial court ordered the State to proffer the nature of the victim impact testimony (Ex. F-2 at 266). The State provided defense counsel with a list of witnesses it intended to call, along with the witnesses' relationship to the victim (Ex. F-11 at 549). The trial court indicated that the State was not required to provide what the witnesses would testify to unless the defense indicated that it had need of a more specific proffer of the potential testimony. *Id.* at 549-50.

During the penalty phase hearing, defense counsel renewed his objection to the presentation of victim impact evidence (Ex. F-23 at 1555). Defense counsel requested that a special instruction be read to the jury prior to the admission of victim impact evidence. *Id.* at 1558. The instruction would caution the jury as to how they could consider victim impact evidence. *Id.* at 1559. The trial court granted the request in part and instructed the jury as follows: "Ladies and gentlemen of the jury, you will now be presented with evidence concerning Michelle Van Ness. Now this evidence is permitted by law and is

_____

[14]Petitioner adopted all of Jeffrey's pre-trial motions. *Id.* at 164-65.

designed to demonstrate Michelle Van Ness' uniqueness as a human being and the result of loss to the community's members by her death." *Id.* at 1572. The State presented testimony of twelve witnesses, consisting of the victim's friends, teacher, parents, aunt, uncle, grandparents, cousin, former boyfriend, and brother who testified regarding the victim's uniqueness and contributions to her community and the loss the community has felt upon her death (Ex. F-23 at 1556-1639).

Hannah Glidden ("Glidden") testified that she knew the victim since first grade and that she was a great friend who taught her about friendship and forgiveness. *Id.* at 1572-74. Glidden noted that the victim was her "spiritual helper." *Id.* at 1573. Ashley Lebvre ("Lebvre") testified that she knew the victim because they went to the same church and noted that the victim was loved by her peers, friends, classmates, church and others. *Id.* at 1575-77. Lebvre testified that since the victim's death she feels a stronger appreciation that she is alive. *Id.* at 1578. Louis Mora ("Mora") was dating the victim when she died and told the jury that the victim was an amazing, honest person that had many friends. *Id.* at 1580. Mora stated that her death "threw him off track" resulting in poor grades in college and his inability until the time of the penalty phase to have romantic relationships. *Id.* at 1581. Deborah Wingard ("Wingard"), the victim's teacher at Warner Christian Academy, testified that the victim was a good student, very caring and loving, helped younger students, was genuine and unselfish, and had voiced her interest in working with children in the future. *Id.* at 1582-84.

The victim's uncle, Steve Mahnke ("Steve"), testified that the victim was bubbly, full

of life, and always received numerous phone calls because she was so loved. *Id.* at 1590.

Steve testified that his sister, the victim's mother, and brother-in-law moved away to

Virginia as a result of her death and would never be the same. *Id.* Steve also noted that

because the victim died on Mother's Day, his sister would never have a good Mother's Day

again. *Id.* at 1591. Bonnie Van Ness ("Bonnie"), the victim's aunt, testified on her own

behalf and read Tara Setzer's ("Setzer") letter. *Id.* at 1594. Setzer, the victim's cousin, told

the jury that she could no longer become close to others because she was afraid of losing

them too. *Id.* at 1593. Bonnie told the jury how loving and caring the victim was and how

she brought joy into everyone's life. *Id.* at 1598. Arthur Mahnke, Jr. ("Arthur"), the

victim's grandfather, read his statement to the jury, which noted that society had lost a

person who could have greatly contributed to make the world better. *Id.* at 1605. Arthur

also testified that his family would never be the same. *Id.* Dorothy Mahnke ("Dorothy"),

the victim's grandmother, recounted several stories about the victim, and stated how the

victim was always helpful to her around the home. *Id.* at 1608. Dorothy testified that the

victim made a difference in many people's lives. *Id.* at 1610.

Connie Van Ness ("Connie"), the victim's mother, testified that the victim always

strived to not only achieve her best, but to help others attain their best as well. *Id.* at 1612.

Connie stated that she was social and loved people. *Id.* Moreover, Connie told the jury

about the victim's special relationship with her boyfriend, Mora, and her brother, Sean. *Id.*

Connie stated that the victim was generous, strong, and loving, and mourned the fact that

she would never see her daughter graduate high school or college, get married, or have

children.  *Id.* at 1613.

Larry Van Ness ("Larry"), the victim's father, testified that the victim excelled in school, was social, and balanced her school and social life along with church.  *Id.* at 1622.  Larry stated that his daughter was driven, caring, and would always help others.  *Id.* at 1623-24.  Larry noted how his daughter's death had ripped his family apart and now they prefer to be alone rather then be around people.  *Id.* at 1631.  Finally, Sean Van Ness ("Sean"), the victim's older brother testified, noting that shortly after his sister's death he was honorably discharged from the Army.  *Id.* at 1636.  Sean testified generally about how difficult his life is now after losing his sister, who was a very unique person.  *Id.* at 1636-38.  At the conclusion of the penalty phase, the trial court read the jury the following instruction with respect to the victim impact testimony:

> Now, you've heard evidence concerning Michelle Vaness [sic] from friends and members of her family.  This evidence is neither an aggravating circumstance nor any part of an aggravating circumstance which you may consider in rendering your verdict.  However, you may consider this evidence insofar as it demonstrates her uniqueness as an individual human being and the result of [the] loss to the community and its members by her death.

(Ex. F-28 at 2409).

In *Payne v. Tennessee*, 501 U.S. 808, 827 (1991), the Supreme Court of the United States overruled *Booth v. Maryland*, 482 U.S. 496 (1987), and *South Carolina v. Gathers*, 490 U.S. 805 (1989) and  held "that if [a] State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar."  The Court found that  "[a] State may legitimately conclude that evidence about the

victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Id.* However, the Court also noted that only when victim impact evidence "is so unduly prejudicial that it renders the trial fundamentally unfair" is relief warranted pursuant to the Due Process Clause of the Fourteenth Amendment. *Id.* at 825 (citing *Darden v. Wainwright*, 477 U.S. 168, 179-83 (1986)). While the Supreme Court did not specifically address victim impact evidence from non-family members, many circuits have held that the Constitution allows victim impact evidence from non-family members. *United States v. Whitten*, 610 F.3d 168, 188 (2d Cir. 2010); *United States v. Bolden*, 545 F.3d 609, 625 (8th Cir. 2008); *United States v. Fields*, 516 F.3d 923, 946 (10th Cir. 2008); *United States v. Bernard*, 299 F.3d 467, 478 (5th Cir. 2002).

Petitioner argues this evidence became a feature of the penalty phase and improperly inflamed the jury's emotions, passion, and sympathy (Doc. No. 56 at 24-25). This Court disagrees. The victim impact evidence admitted during the penalty phase was properly admitted as there is no per se rule prohibiting such evidence. Additionally, Petitioner has not demonstrated that the victim impact evidence became a feature of the penalty phase and was so unduly prejudicial that it rendered the trial fundamentally unfair. The State presented other evidence not relating to victim impact evidence; specifically, the State presented evidence from the three surviving victims about the facts of the crimes, testimony from the police officers who investigated the case, and Petitioner and his co-defendant's statements made after the crime was committed (Ex. F-21 - F-24).

Although the Supreme Court of the United States has not further delineated when victim impact evidence amounts to undue prejudice that results in an unfair trial, several courts have found that the bar for demonstrating undue prejudice is high. *See United States v. Bolden*, 545 F.3d 609, 626-27 (8th Cir. 2008) (testimony of sixteen victim impact witnesses was not error); *United States v. Barnette*, 211 F.3d 803, 818-19 (4th Cir.2000), *vacated on other grounds*, 546 U.S. 803 (2005) (allowing family members to present stories of victims' childhoods, family experiences, and trauma resulting from victims' deaths, as well as poems reflecting deep sadness and regret); *United States v. McVeigh,* 153 F.3d 1166, 1218–22 (10th Cir.1998), *overruled on other grounds by* 184 F.3d 1206 (10th Cir. 1999) (permitting a total of 38 witnesses to recount, among other things: last contacts with victims, efforts to discover victims' fates, discovery of body parts months after victims' deaths, uncontrollable screaming and crying upon hearing of victims' deaths, victims' life histories and personal accomplishments, and innocence and unconditional love manifested by child victims); *Davis v. Singletary*, 853 F. Supp. 1492, 1541-42 (M.D. Fla. 1994) (finding victim impact evidence from eight family members and one close friend was not unconstitutional). Petitioner cites to no case law that holds victim impact statements in similar circumstances rendered the sentencing phase of a capital murder case fundamentally unfair. Thus, the victim impact evidence of the twelve witnesses in the instant case was not unduly prejudicial, nor did it render the trial fundamentally unfair.

Moreover, the trial court instructed the jury that it could not consider the victim impact testimony as evidence of aggravating circumstances. Juries are presumed to follow

the court's instructions. *Puiatti v. McNeil*, 626 F.3d 1283, 1315 (11th Cir. 2010) (citations omitted). Petitioner has not demonstrated that the trial court's decision to admit the above victim impact evidence resulted in prejudice.

Additionally, to the extent that Petitioner also argues that the prosecutor engaged in improper argument when he compared the life of Petitioner to the life of the victim (Doc. No. 56 at 28), the Court finds that Petitioner is not entitled to relief. Petitioner does not cite to where in the State's closing arguments the prosecutor improperly compared the victim's life to the Petitioner's life. The Court has reviewed the record and finds that the State did not improperly compare the life of the victim to the life of Petitioner. The only portion of closing argument that arguably could be read as comparing the life of the victim to that of Petitioner is when the prosecutor stated the following:

> And you may consider any aspects of their [the defendants'] character, record or background, or any other circumstance of the events, so certainly you may consider anything you've heard. And after you consider that, you certainly may consider the uniqueness of Michelle and the awful suffering by her.
>
> We respectfully contend that even if you found every one of these mitigators, in most of them there is no evidence to support them at all. But if you did find all of them, they don't outweigh, they don't outweigh the aggravating circumstances that we have proven beyond a reasonable doubt. We don't have a lot of birthday cards. We don't have a history of the last six years of Michelle. It just ended. Over, that's it.
>
> That day while Anthony and Jeffrey were preparing to rob, everyone else was going on with life as normal. You know, we have a normalcy we expect out of life. You believe you're going to get up in the morning. You believe the sun is going to shine, and part of the reason we have that security is because we have law. We have good laws.

(Ex. F-28 at 2363-64).

In *Payne*, the Supreme Court of the United States cautions, in dicta, against comparing the worth of different victims. 501 U.S. at 823 (noting that "victim impact evidence is not offered to encourage comparative judgments . . . for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not."). The *Payne* Court did not hold or state otherwise in dicta, that it is impermissible for a prosecutor to made arguments that compare the worth of the victim's life to a defendant's life and federal courts have agreed that *Payne* "is no obstacle to victim-to-defendant comparisons." *Burns v. Dep't of Corr.*, No. 8:07-cv-1275-T-23AEP, 2011 WL 3563102, at * 10 (M.D. Fla. Aug. 10, 2011); *see also Jackson v. Johnson*, 523 F.3d 273, 280 (4th Cir. 2008) ("In light of *Payne's* silence regarding victim-to-defendant comparisons, we cannot say that the Supreme Court of Virginia unreasonably applied *Payne* in rejecting Jackson's purported comparative-worth argument."); *United States v. Fields*, 483 F.3d 313, 340 (5th Cir. 2007) ("[T]o the extent that the Court expressed disapproval of comparative worth arguments, it did so only with regard to victim-to-victim comparisons, not victim-to-defendant comparisons."). Consequently, this portion of ground eight does not state a viable claim for relief.

Petitioner has not demonstrated that the state court's determination of this claim was contrary to, or resulted in an unreasonable application of, clearly established federal law. Accordingly, claim eight is denied pursuant to § 2254(d).

### F.   *Claim Nine*

Petitioner claims that the trial court erred by instructing the jury on the heinous,

atrocious, or cruel ("HAC") aggravator and later finding the existence of this aggravator (Doc. No. 49 at 56-57). Petitioner maintains that the record does not reflect any evidence that demonstrates the existence of the HAC aggravator. *Id.*

At the conclusion of the penalty phase, the trial court instructed the jury with respect to the HAC aggravator as follows:

> The crimes for which the defendant is to be sentenced was [sic] especially heinous, atrocious, or cruel.
>
> Heinous means extremely wicked or shockingly evil. Atrocious means outrageously wicked and vile. Cruel means designed to inflict a high degree of pain with utter indifference to or enjoyment of the suffering of others.
>
> The crime, the kind of crime intended to be included as heinous, atrocious or cruel is one accompanied by additional acts that show that the crime was consciousless or pitiless and was unnecessarily torturous to the victim.

(Ex. F-28 at 2403). In its sentencing order, the trial court specifically found the existence of the HAC aggravator (Ex. F-3 at 357). The trial court found the victim's death was not instantaneous merely because the death was by gunfire. *Id.* The trial court found that Petitioner and his co-defendant subjected the victim to "extreme terror" and "mental torture," noting that the victim begged for her life, cried, and verbally expressed her fears as she watched Petitioner and his co-defendant tie her and the other victims up, knowing she was about to die. *Id.* The court stated that the cruel nature of the crime focused on mental and emotional cruelty rather than physical torture. *Id.* The court afforded this aggravator moderate weight. *Id.*

Petitioner challenged the trial court's findings on appeal (App. G). The Supreme

Court of Florida rejected the instant claim. *Farina II*, 801 So. 2d at 53. The court stated that "'[f]ear and emotional strain may be considered as contributing to the heinous nature of the murder, even where the victim's death was almost instantaneous.'" *Id.* (quoting *Preston v. State*, 607 So. 2d 404, 410 (Fla. 1992)). The court concluded that the victim's mental anguish, awareness of her impending death, emotional state throughout the crime, and observation of the defendants shooting two of her coworkers first supported the trial court's finding of the HAC aggravator. *Id.*

"[I]n determining whether a state court's application of its constitutionally adequate aggravating circumstances was so erroneous as to raise an independent due process or Eighth Amendment violation, we think the more appropriate standard of review is the 'rational facfinder' standard established in *Jackson v. Virginia*, 443 U.S. 307 (1979)." *Lewis v. Jeffers*, 497 U.S. 764, 781 (1990). The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim in a habeas petition, a federal court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Owen v. Sec'y for Dep't of Corr.*, 568 F.3d 894, 918 (11th Cir. 2009).

Although usually an "instantaneous or near-instantaneous death by gunfire does not satisfy the aggravating circumstance of heinous, atrocious, or cruel," *Robinson v. State*, 574 So. 2d 108, 112 (Fla. 1991), Florida courts have also held that shooting deaths can satisfy the HAC aggravator if the State "has presented other evidence to show some

45

physical or mental torture of the victim." *Hartley v. State*, 686 So. 2d 1316, 1323 (Fla. 1996).

Florida courts have also held that the HAC aggravator "pertains more to the victim's

perception of the circumstances than to the perpetrator's." *Hitchcock v. State*, 578 So. 2d 685,

692 (Fla. 1990), *vacated on other grounds by* 505 U.S. 1215 (1992). "Fear and emotional strain

can contribute to the heinousness of a killing." *Id.* at 693 (citing *Adams v. State*, 412 So. 2d

850 (Fla. 1982)). In *Cave v. State*, 727 So. 2d 227, 229 (Fla. 1998), the Supreme Court of

Florida found no error in the trial court's finding of the HAC aggravator where the victim

was kidnapped at gunpoint, pled for her life during a fifteen to eighteen minute car ride,

and was then shot and stabbed. The court opined that the terror the victim must have felt

was sufficient to meet the definition of especially heinous, atrocious or cruel. *Id.*

Additionally, in *Parker v. State*, 873 So. 2d 270, 287 (Fla. 2004), the court affirmed the trial

court's finding of the HAC aggravator where the victim had asked the defendants where

they were taking her, she was frightened, her hair had been ripped from her head, her

bladder was void, and she had suffered a stab wound.

Applying the *Jackson* standard, and giving due deference to the state court's

unrebutted findings of fact, 28 U.S.C. § 2254(e), the Court determines that a rational

factfinder could have found that the killing was especially heinous, atrocious or cruel. The

evidence presented at the second penalty phase demonstrates that when Derek Mason

("Mason") and deceased victim Michelle Van Ness ("victim" or "Michelle") exited the Taco

Bell restaurant after it had closed to place trash bags in the dumpster, two men approached

them (F-21 at 1264-65). One man placed a gun in Mason's back and the other held a knife

to the victim. *Id.* at 1256. After entering the building and retrieving money from the safe, Petitioner and his brother began tying the employees' hands behind their backs. *Id.* at 1266-67. Michelle was crying and holding on to Mason's arm. *Id.* at 1268. Mason reassured her that everything would be okay. *Id.* After gathering the four employees into the walk-in freezer of the restaurant, Jeffrey pointed his gun at Gary Robinson ("Robinson") and shot him in the chest. *Id.* at 1271. Jeffrey then shot Mason in the face. *Id.* Mason heard another shot and saw Michelle fall to the floor. *Id.*

Kimberly Gordon ("Gordon") and Robinson also testified that Michelle was crying prior to being shot and kept stating that she did not want to be hurt (F-22 at 1487; F-23 at 1528). Gordon noted that she and the other employees tried to keep Michelle calm because she was upset and afraid (F-22 at 1487). Robinson testified that Michelle repeatedly stated that she thought the employees were going to be killed (F-23 at 1528). Robinson also stated that either Petitioner or Jeffrey told them that no one would be hurt. *Id.* Robinson testified that when Jeffrey began shooting, there was a lot of noise in the freezer because the employees were "yelling, crying, screaming." *Id.* at 1531.

The record supports the state court's findings that Michelle was subjected to extreme terror and mental torture because there was evidence that she was crying during the entire incident, verbally expressed her fears to the other employees, asked not to be hurt, and watched two of her co-workers be shot prior to her own death. Similar to *Cave* and *Parker*, the victim in the instant case suffered from fear and emotional strain after she was made to enter the restaurant at knife-point and then had her hands bound, before being shot.

47

Petitioner has not demonstrated that the state court's determination of this claim was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. Accordingly, ground nine is denied pursuant to § 2254(d).

### G. Claim Ten

Petitioner contends that the trial court erred in instructing the jury on and finding the cold, calculated, and premeditated ("CCP") aggravator (Doc. No. 49 at 60). Petitioner contends that the evidence does not support a finding of this aggravator. *Id.* The trial court instructed the jury on the CCP aggravator as follows:

> The crime for which the defendant is to be sentenced was committed in a cold and calculated and premeditated manner and without any pretense to moral or legal justification.
>
> Now, cold means the murder was the product of a calm and cool reflexion [sic]. Calculated means having a careful plan or prearranged design to commit murder.
>
> Now, killing is premeditated if it occurs after the defendant consciously decides to kill. The decision must be present in the mind at the time of the killing. Now, the law does not fix the exact period of time that must pass between the formation of the premeditated intent to kill and the killing. The period of time must be long enough to allow reflexion [sic] by the defendant. The premeditated intent must be formed before the killing; however, in order for this aggravating circumstance to apply, a heightened level of premeditation demonstrated by a substantial period of reflexion [sic] is required.

(Ex. F-28 at 2403-04). The trial court found the existence of the CCP aggravator (Ex. F-3 at 357). The trial court stated that the defendants "knew from the beginning of their Taco Bell plans that they would have to execute witnesses." *Id.* The court further found the

following:

> Their target was Taco Bell because of Anthony's familiarity with the restaurant, its employees and procedures. Anthony further prepared by making a quick visit to the restaurant just before the robbery to see who was working. Their preparations included purchasing the bullets that killed Michelle - bullets that were not weapons of convenience discovered at the scene at the last moment. The Court rejects as unbelievable the suggestion that the defendants' elaborate plans were made without thinking about the inevitable problem of employee/witnesses who would know them and could identify them. After Anthony's preliminary visit to the restaurant, but before the robbery, the Farinas discussed the fact that Anthony knew three of the employees who were working that night. The Court also rejects as unbelievable the explanation that the bullets were only to be used in self-defense, if necessary. Death of witnesses was an integral part of the defendants' plan at least as early as the purchase of the bullets and other supplies. Furthermore, the cold and calculated nature of their plan is demonstrated by the methodical way the defendants rounded up the victims, herded them into a confined execution area where they were easier to control, tired to calm and control them with cigarettes and false words of comfort, and announced "one last precaution" before rounding them up and begging to shoot. Anthony's comment, "Your call . . . ." to Jeffrey just before the shooting and stabbing began was further proof of the decision to carry out plans to kill. Heightened premeditation is clearly present in these facts, and none of the employees offered any resistance to give the defendants any pretense of self-defense or any other moral or legal justification.

*Id.* at 357-58. The trial court gave this aggravating factor great weight. *Id.*

Petitioner challenged the trial court's findings on appeal (App. G). The Supreme Court of Florida rejected the instant claim. *Farina II*, 801 So. 2d at 53-54. The court stated that the fact that Petitioner chose the specific Taco Bell because he was familiar with its employees and procedures, had visited the restaurant earlier in the evening to see who was working, had discussed with Jeffrey the fact that he knew three employees, had purchased bullets for a gun, rounded the employees up and confined them to a small area, their

49

discussion prior to the shooting and Anthony's comment that it was Jeffrey's "call", and the lack of resistance all support the finding that the murder was cold, calculated, and premeditated. *Id.*

The CCP aggravator can be proven by circumstantial evidence, such as facts showing "an advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course." *Ballard v. State*, 66 So. 3d 912, 919 (Fla. 2011) (citing *Swafford v. State*, 533 So. 2d 270 (Fla. 1988)). This Court finds that a rational factfinder could have found that the killing was cold, calculated, and premeditated pursuant to *Jackson*. 443 U.S. at 319. Petitioner testified at the *Spencer* hearing that he had initially planned to commit a robbery of the Taco Bell with a person other than his brother, but when those plans fell through, he discussed committing the robbery with Jeffrey (Ex. F-29 at 2474). This plan evolved approximately two to three weeks prior to the actual incident. *Id.* Petitioner picked the Taco Bell restaurant as the location of the robbery because he had been employed there and knew or understood the safe and security system. *Id.* at 2476. Earlier in the day on May 8, 1992, Petitioner went to the restaurant, where he had a conversation with Michelle, who he had worked with before. *Id.* at 2480. At that time Petitioner also saw Mason. *Id.* at 2481. Petitioner went to the Taco Bell in order to "check out" who was there and decide whether to commit the robbery then or wait until the restaurant closed. *Id.* at 2481. The restaurant later closed, and Petitioner and Jeffrey waited until they saw employees taking trash bags outside to enter the building. *Id.* at 2481-83.

Mason testified that he knew Petitioner prior to the robbery and murder because Petitioner had worked at the Taco Bell (Ex. F-21 at 1263). Moreover, Gordon also knew Petitioner, and saw Petitioner enter the restaurant earlier in the evening (Ex. F-22 at 1481). Mason, Gordon, and Robinson each described how Petitioner and Jeffrey tied their hands behind their backs and moved them into the freezer even though they had stated that no one would be hurt (Ex. F-21 at 1267-70; Ex. F-22 at 1484-88; Ex. F-23 at 1529-30). Gordon also testified that prior to making the employees enter the freezer, Petitioner stated that he had "one more precaution to take" (Ex. F-22 at 1488). Mason noted that once the employees were in the freezer, Petitioner and Jeffrey had a conversation outside the freezer door but Mason could not hear the details of the conversation (Ex. F-21 at 1278-79). Both Gordon and Robinson noted that Petitioner and Jeffrey were wearing gloves and that they seemed calm (Ex. F-22 at 1484-85; F-23 at 1530).

Although Petitioner testified that he had no prior knowledge that Jeffrey purchased a firearm, because there were no plans to use a firearm in connection with the robbery, Petitioner was present with Jeffrey to purchase bullets and other supplies necessary to commit the robbery (Ex. F-29 at 2475, 2477-78). Police found receipts from a K-Mart store in Jeffrey's checkbook that indicated that a box of firearm shells, clothesline, and gloves were purchased on the day the crime was committed (F-22 at 1429-31). Additionally, while Petitioner states that he had no plan to commit murder (Ex. F-29 at 2483), he stated in a conversation with his brother that was taped by police that they should have sliced the victims' throats and closed the freezer doors so that they could not have left the freezer and

51

called the police (Ex. F-23 at 1655).

Petitioner also testified that after they made the employees step into the freezer, Jeffrey noted that these witnesses knew him and could identify him (Ex. F-29 at 2491). Jeffrey asked what they "should do about" it and Petitioner stated that it was Jeffrey's call on whether he wanted to shoot them or not. *Id.* at 2492. Petitioner testified that prior to that discussion there was no plan to shoot any of the witnesses. *Id.* Dr. Clifford Levin, psychologist, testified that Petitioner told him that he had planned the robbery for several weeks and had discussed with his brother whether they would kill any witnesses (Ex. F-26 at 2140-41).

The evidence supports a finding that the murder was cold, as there is no indication that Petitioner was in an emotional frenzy; the victims testified that Petitioner appeared calm and collected. Moreover, the record reflects that Petitioner and Jeffrey purchased bullets and engaged in prior discussions about whether they should leave witnesses, which is evidence that the murder was calculated or planned and premeditated. Additionally, Petitioner's comments after the crime that they should have slit the victims' throats and closed the freezer so they could not leave to call police also tend to prove the existence of the CCP aggravator. Moreover, the advance procurement of the firearm, bullets, and other supplies to commit the crime, the fact that the victims did not resist, and the fact that the victims were all shot or stabbed even after being assured no one would be hurt is circumstantial evidence that proves the CCP aggravator. Petitioner has not demonstrated that the state court's determination of this claim was contrary to, or involved an

unreasonable application of, clearly established federal law as determined by the United

States Supreme Court.  Accordingly, ground ten  is denied pursuant to § 2254(d).

### H.      Claim Eleven

Petitioner claims that the trial court erred in finding that the homicide was

committed for the purpose of avoiding arrest (Doc. No. 49 at 62).  Petitioner argues that the

evidence was insufficient to support the finding of this aggravator.  *Id.* at 62-63.  The trial

court instructed the jury that it could consider that "[t]he crimes for which the defendant

is to be sentenced was committed for the purpose of avoiding or preventing a lawful arrest

or effecting an escape from custody" (Ex. F-28 at 2403).  The trial court found the existence

of this aggravator (Ex. F-3 at 356).  The court stated the following:

> The evidence proving this aggravating factor includes the defendants'
> knowledge that because of Anthony's previous employment at this Taco Bell
> some of the employees would know him.  Anthony's visit to the restaurant
> shortly before the robbery to see who was working verified that there were
> in fact witnesses who could identify him if they carried out their plans.  After
> receiving the money without resistence, the defendants methodically moved
> the victims to a small, confined area of the restaurant to facilitate their
> execution.  Just before the killings the brothers discussed the need to
> eliminate the witnesses who knew them.  This, coupled with the execution[-
> ]style of shooting the victim/witnesses clearly demonstrates the intent to
> eliminate witnesses and avoid detection and arrest.  The Court gave this
> factor great weight.

*Id.*  Petitioner challenged these findings on direct appeal (App. G).  The Supreme Court of

Florida found that the lower court properly found the existence of this aggravator, noting

that the fact that the victims knew and could identify Petitioner and his brother, coupled

with the fact they were armed, had rope and gloves, confined the victims to a small area,

discussed the need to eliminate the witnesses, shot the witnesses execution-style, and had no resistence from the victims indicated that this aggravator was properly found. *Farina II*, 801 So. 2d at 54-55.

The avoiding arrest and/or eliminating witnesses aggravator "focuses on the motivation for the crimes." *Jennings v. State*, 718 So. 2d 144, 151 (Fla. 1998). "'[T]he mere fact of a death is not enough to invoke this factor . . . . Proof of the requisite intent to avoid arrest and detection must be very strong.'" *Consalvo v. State*, 697 So. 2d 805, 819 (Fla. 1996) (quoting *Riley v. State*, 366 So. 2d 19, 22 (Fla. 1978)). The evidence "must prove that the sole or dominant motive for the killing was to eliminate a witness." *Id.* (citations omitted). "Mere speculation on the part of the state that witness elimination was the dominant motive behind a murder cannot support the avoid arrest aggravator." *Id.* The avoid arrest aggravator may be proved by circumstantial evidence. *Id.* (citing *Swafford v. State*, 533 So. 2d 270, 276 (Fla. 1988)). Moreover, the fact that the victims knew and could identify the perpetrator, without more, is insufficient to prove the avoid arrest aggravator. *Jennings*, 718 So. 2d at 151. A court may also consider such things as whether the defendant used gloves or a mask, whether the victim resisted, or whether the victim was in a position to pose a threat to the defendant. *Parker v. State*, 873 So. 2d 270, 289 (Fla. 2004).

The *Jennings* court held that the trial court properly found the existence of the avoid arrest aggravator where the victims knew and could identify their killer, the defendant used gloves and mask, stated that if he committed a robbery he would not leave witnesses, bound the victims' hands, there was no evidence of resistence, the victims were confined

to a freezer, and an immediate threat could have been eliminated by closing and securing the freezer door. 718 So. 2d at 151. Similar to *Jennings*, in this case three of the four victims knew Petitioner prior to the commission of the robbery, and all of the victims could identify Petitioner and his brother. Moreover, Petitioner and Jeffrey used gloves and tied the victims hands behind their backs. In this case there was no evidence that any of the victims resisted. Additionally, Petitioner and Jeffrey confined the victims to the freezer and could have contained the victims there simply by shutting and locking the freezer door. Instead, Jeffrey shot three of the victims, and after the gun misfired, stabbed the fourth victim in the head and back. Based on the evidence, there was no reason to kill the victims except to eliminate them as witnesses to the robbery. *See id*. Petitioner also made a statement while having a conversation with Jeffrey that they should have slit the victims' throats and secured the freezer door. The court finds that the evidence was sufficient to support a finding of the avoid arrest/witness elimination aggravating circumstance. Petitioner has not demonstrated that the state court's determination of this claim was contrary to, or resulted in an unreasonable application of, clearly established law as determined by the Supreme Court of the United States. Accordingly, this claim is denied pursuant to § 2254(d).

## I.     *Claim Twelve*

In claim twelve Petitioner alleges that his death sentence is disproportionate and thus violates his Fifth, Eighth, and Fourteenth Amendment rights (Doc. No. 49 at 64). Petitioner maintains that not only is his death sentence disproportionate to Jeffrey's

sentence, but also to sentences in other death penalty cases. *Id.* at 65. The Florida Supreme Court held that Petitioner's sentence was proportionate to other cases where the court had upheld death sentences. *Farina II*, 801 So. 2d at 56. Moreover, the court noted that because Jeffrey's death sentence was never constitutional or a valid sentence, Petitioner's death sentence was not disproportionate to Jeffrey's life sentence. *Id.* (citing *Henyard v. State*, 689 So. 2d 239, 254-55 (Fla. 1996) (finding the defendant's death sentence was not disproportionate to fourteen year old codefendant's life sentence)).

Respondents argue that the instant claim is unexhausted because Petitioner did not raise the federal constitutional basis of the claim on direct appeal. The Court agrees. The petitioner must apprise the state court of the federal constitutional issue, not just the underlying facts of the claim or a similar state law claim in order to exhaust a claim. *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998). Petitioner did not cite to any federal constitutional issues when raising the instant claim on direct appeal (Ex. G). Moreover, the Supreme Court of Florida did not consider any federal constitutional issues when it addressed this claim. *Farina II*, 801 So. 2d at 56.

The Court is precluded from considering this claim, as it would be procedurally defaulted if Petitioner returned to state court. *Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1342 (11th Cir. 2009) (citing *Snowden*, 135 F.3d at 736 ("[W]hen it is obvious that the unexhausted claims would be procedurally barred in state court due to state-law procedural default, we can forego the needless 'judicial ping-pong' and just treat those claims now barred by state law as no basis for federal habeas relief.")). Petitioner could not

return to the state court to raise these grounds, as he has already appealed and the claim is not properly raised in a Rule 3.851 motion. Thus, the claim is procedurally defaulted.

Moreover, Petitioner has neither alleged nor shown cause or prejudice that would excuse any procedural default. *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). Likewise, he has not shown the applicability of the actual innocence exception. *Murray v. Carrier*, 477 U.S. 478, 496 (1986). A review of the record reveals that Petitioner is unable to satisfy either of the exceptions to the procedural default bar. Therefore, claim twelve is procedurally barred from review.

Even if the instant claim were not procedurally barred, this Court cannot grant Petitioner relief on the merits of his claim. The Supreme Court of the United States has held that proportionality review is not required by the U.S. Constitution. *See Pulley v. Harris*, 465 U.S. 37, 43-44 (1984). In addition, where state law requires proportionality review, the Eleventh Circuit has held that:

> A federal habeas court should not undertake a review of the state supreme court's proportionality review and, in effect, "get out the record" to see if the state court's finding of fact, their conclusion based on a review of similar cases, was supported by the "evidence" in the similar cases. To do so would thrust the federal judiciary into the substantive policy making area of the state.

*Moore v. Balkcom*, 716 F.2d 1511, 1518 (11th Cir. 1983) (citing *California v. Ramos*, 103 S. Ct. 3446, 3451-53 (1983)); see also *Mills v. Singletary*, 161 F.3d 1273, 1281-82 (11th Cir. 1998). Moreover, the Eleventh Circuit has rejected the argument that federal law requires those state courts which are required to undertake such review, to "make an explicit detailed

account of their comparisons." *Lindsey v. Smith*, 820 F.2d 1137, 1154 (11th Cir. 1987). In doing so, the Eleventh Circuit explicitly stated:

> [W]e refuse to mandate as a matter of federal constitutional law that where, as here, state law requires such review, courts must make an explicit, detailed account of their comparisons. Based on their own past experience in reviewing capital punishment cases, state appellate courts "can rationally distinguish between those individuals for whom the death penalty is an appropriate sanction and those for whom it is not," *Spaziano v. Florida*, 468 U.S. 447 (1984), without listing in their opinions the facts that did not justify the imposition of the death penalty in prior cases.

*Id.*

To the extent Petitioner challenges the Florida Supreme Court's proportionality review and requests this Court to conduct a de novo proportionality review of his sentence, he is not entitled to such relief. The Florida Supreme Court conducted a proportionality review as required by Florida law and determined that no re-sentencing was warranted. There is no evidence that this was done arbitrarily or capriciously. The review provided an adequate safeguard of Petitioner's constitutional rights. Claim twelve is denied.

## J.     *Claim Thirteen*

Petitioner claims that the State of Florida's death penalty scheme is unconstitutional for seven different reasons: (1) the statutory aggravators are vague and overbroad; (2) the requirement that a defendant must prove sufficient mitigating circumstances that outweigh aggravating circumstances is unconstitutionally vague and overbroad; (3) requiring a defendant to prove mitigating circumstances unconstitutionally places the burden of proof

upon the defendant; (4) the statutory aggravators are applied in an arbitrary, capricious, and inconsistent manner; (5) the lack of notice as to which statutory aggravators will be applied is unconstitutional; (6) the absence of requiring a special verdict or specific findings renders the statutory scheme unconstitutional; and (7) death by electrocution constitutes cruel and unusual punishment (Doc. No. 49 at 68-69).

Petitioner raised these claims on direct appeal (App. G). The Supreme Court of Florida summarily rejected most of the claims without discussion. *Farina II*, 801 So. 2d at 55. Moreover, the court noted that with respect to Petitioner's electrocution claim, the Florida Legislature had recently amended the statute to provide that execution is by lethal injection unless a person affirmatively elects to be executed by electrocution. *Id.* (citing Fla. Stat. § 922.105).

### 1.     The Statutory Aggravators are Overbroad and Vague

Petitioner alleges that the statutory aggravators listed in section 921.141 of the Florida Statutes are overbroad and vague. Five statutory aggravators were found in the instant case: (1) the defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person; (2) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody; (3) the capital felony was committed for pecuniary gain; (4) the capital felony was especially heinous, atrocious, or cruel; and (5) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of

moral or legal justification.

Petitioner first alleges that the jury instruction on whether he had previously been convicted of another felony is unconstitutionally vague. The Supreme Court of the United States has found that federal review of vagueness challenges is "quite deferential. As long as an aggravating factor has a core meaning that criminal juries should be capable of understanding, it will pass constitutional muster." *Jones v. United States*, 527 U.S. 373, 400 (1999) (citing *Tuilaepa v. California*, 512 U.S. 967, 973 (1994)). The jury was given the standard jury instruction on this aggravator, that they had to determine that Petitioner was previously convicted of a felony involving the use or threat of violence to some person (Ex. F-28 at 2402). *See* Fla. Std. Jury Inst. (Crim.) § 7.11. The court told the jury that crimes such as attempted first degree murder, robbery with a weapon or firearm, or burglary of an occupied structure with a battery are all felonies that involve the use or threat of violence to another person. *Id.* The trial court found that Petitioner's contemporaneous convictions of attempted murder, armed robbery, and burglary all supported this aggravating factor (Ex. F-3 at 356).

Petitioner has not demonstrated that this factor was unconstitutionally vague or that any of the terms needed additional defining. Juries would be able to understand whether Petitioner was convicted of other felony crimes that included a threat of violence without further explanation of this aggravator. Florida courts have upheld the finding of this aggravator when defendants are convicted of contemporaneous felonies other than first-degree murder. *Mosley v. State*, 46 So. 3d 510, 526 (Fla. 2009). Furthermore, as Petitioner

does not cite to any United States Supreme Court precedent that invalidates Florida's standard jury instructions on this aggravator the instant claim fails.

Next Petitioner argues that the jury instructions on the avoid arrest aggravator and pecuniary gain aggravator are unconstitutionally vague. The trial court gave the standard jury instructions on these aggravators (Ex. F-28 at 2403). *See* Fla. Std. Jury Inst. (Crim.) § 7.11. The trial court specifically instructed that the jury could consider that "[t]he crimes for which defendant is to be sentenced was committed for the purpose of avoiding or preventing a law arrest . . . ." and that "[t]he crimes for which the defendant is to be sentence was committed for financial gain." *Id.* Petitioner has not demonstrated that the jury was not capable of understanding the meaning of these aggravators without further definition. *Jones*, 527 U.S. at 400. Additionally, Petitioner has not cited to any United States Supreme Court precedent that has found these aggravators unconstitutionally vague. As such, these claims are denied.

With respect to the HAC aggravator, the Court notes that the state trial court gave the standard jury instructions on this aggravator (Ex. F-28 at 2403); Fla. Std. Jury Inst. (Crim.) § 7.11. The Supreme Court of Florida has upheld the standard penalty phase instructions for the HAC aggravator. *See Smithers v. State*, 18 So.3d 460, 472 (Fla. 2009) (citing *Donaldson v. State*, 722 So. 2d 177, 186 n. 10 (Fla. 1998)). Additionally, while the Supreme Court of the United States invalidated an HAC instruction in *Espinosa v. Florida*, 505 U.S. 1079 (1992), on the grounds that it was vague because it failed to define what conduct constituted "heinous," "atrocious," or "cruel" conduct, the instruction in the

instant case specifically defined those terms and therefore provided sufficient guidance so as to save the instruction from a vagueness challenge. *See Gudinas v. McNeil*, No. 2:06-cv-357-FtM-36DNF, 2010 WL 3835776, at *41-42 (M.D. Fla. Sept. 30, 2010); *Hall v. State*, 614 So. 2d 473, 478 (Fla. 1993). Petitioner cites to no United States Supreme Court precedent that invalidates Florida's standard jury instructions on the HAC aggravator and its definitions of each term. Thus, Petitioner's claim must fail.

Finally, Petitioner's challenge to the CCP aggravator also is without merit. The state trial court gave the standard jury instructions on this aggravator (Ex. F-28 at 2403). *See* Fla. Std. Jury Inst. (Crim.) § 7.11. The Supreme Court of Florida has upheld the standard penalty phase instructions on the CCP aggravator. *See Smithers*, 18 So.3d at 472 (citing *Bowles v. State*, 804 So. 2d 1173, 1177 (Fla. 2001)). The standard CCP instruction defines the terms "cold," "calculated," and "premeditated." Petitioner appears to be seeking an expansion of *Espinosa* and its vagueness doctrine. The Court finds that similar to the HAC instruction, the definition of the terms cold, calculated, and premeditated provide sufficient guidance so as to save the instruction from a vagueness challenge. Moreover, Petitioner cites to no United States Supreme Court precedent that invalidates Florida's standard jury instructions on the CCP aggravator, thus Petitioner's claim must fail. *See Brown v. Sec'y, Dep't of Corr.*, No. 8:01-cv-2374-T-23TGW, 2009 WL 4349320, at *47 (M.D. Fla. Nov. 25, 2009) (noting that the Supreme Court has not invalidated Florida's CCP jury instruction on vagueness grounds). Accordingly, this claim must be denied.

**2      *Instructions Regarding the Weighing of Aggravators and***

*Mitigators Are Overbroad and Vague and Method of Proving*
*Mitigators Improperly Shifts the Burden of Proof*

Petitioner next argues that the requirement that a defendant must prove sufficient mitigating circumstances that outweigh aggravating circumstances is unconstitutionally vague and overbroad. Petitioner contends that the requirement of proving mitigators improperly shifts the burden of proof. This claim fails because the Eleventh Circuit has specifically upheld Florida's standard penalty phase jury instructions, which were provided to Petitioner's jury, against the same burden-shifting overbreadth challenge now presented in the instant petition. *Henderson v. Dugger*, 925 F.2d 1309, 1317-18 (11th Cir. 1991); *Bertolotti v. Dugger*, 883 F.2d 1503, 1524-25 (11th Cir. 1989); *Duckett v. McDonough*, 701 F. Supp. 2d 1245, 1288-89 (M.D. Fla. 2010).

**3.      *Lack of Notice as to Statutory Aggravators, Absence of Special Verdict Form, and Arbitrary and Capricious Application of Aggravators***

Petitioner claims that Florida's death penalty sentencing scheme is unconstitutional because there is a lack of notice as to which statutory aggravators will be applied and the jury is not required to use a special verdict form or make specific findings as to which aggravators they are finding. Petitioner also argues that the failure to have the penalty phase jury use a special verdict form violated his constitutional rights. This Court construes these claims as challenges to the death penalty procedure pursuant to *Ring v. Arizona*, 536 U.S. 584 (2002).

In *Ring,* the United States Supreme Court expanded its ruling in *Apprendi v. New*

*Jersey*, 530 U.S. 466 (2000), to the context of capital punishment. 536 U.S. at 584. The *Apprendi* Court held that,"[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Subsequently in *Ring* the Court held that aggravating factors that justify an increase in the maximum punishment for first degree murder from life imprisonment to death become elements of a greater offense and must be found to exist beyond a reasonable doubt by a jury. 536 U.S. at 609.

      *Apprendi* and *Ring* do not apply retroactively to cases that were already final on direct appeal. *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004). Petitioner's case became final on June 10, 2002, the date the Supreme Court of the United States denied his petition for writ of certiorari. *Ring* was not issued until June 24, 2002. However, Petitioner did raise a similar claim on direct appeal (Ex. G). Therefore, even if Petitioner's claim can be considered on the merits, it has been repeatedly determined that the "Florida capital sentencing procedures do not create the Sixth Amendment error identified in *Ring*." *Grossman v. Crosby*, 359 F. Supp. 2d 1233, 1284 (M.D. Fla. 2005). The Florida Supreme Court has rejected numerous *Ring* challenges, consistently finding that Florida's sentencing scheme comports with the Sixth Amendment. *See Kormondy v. State*, 845 So. 2d 41, 54 (Fla. 2003) (*Ring* does not encompass Florida procedures or require either notice of the aggravating factors that the State will present at sentencing or a special verdict form indicating the aggravating factors found by the jury); *Bottoson v. Moore*, 833 So. 2d 693 (Fla. 2002); *King v. Moore*, 831 So. 2d 143 (Fla. 2002).

64

Petitioner also contends that the Florida death penalty statutes are unconstitutional because the aggravators are applied in an arbitrary and capricious manner. Petitioner has not advanced any showing of how the aggravators are improperly applied. Vague, conclusory allegations are inadequate as a matter of law to raise a cognizable claim. *See Tejeda v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (stating vague, conclusory, speculative and unsupported claims cannot support relief for ineffective assistance of counsel); *United States v. Cranshaw*, 817 F. Supp. 723, 728 (N.D. Ill. 1993). Additionally, the Supreme Court has consistently upheld Florida's capital sentencing scheme. *See Hildwin v. Florida*, 490 U.S. 638 (1989); *Proffitt v. Florida*, 428 U.S. 242 (1976).

Petitioner has not demonstrated that the state court's determination of these claims are contrary to, or resulted in an unreasonable determination of, clearly established federal law. Therefore, these claims are denied pursuant to § 2254(d).

### 5.   *Death by Electrocution is Cruel and Unusual Punishment*

Petitioner argues death by electrocution constitutes cruel and unusual punishment. Section 922.105(1), Florida Statutes, provides that a "death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution." Thus, Petitioner's claim regarding death by electrocution is now moot. Moreover, both federal and Florida courts have upheld electrocution as a method of execution. *See Felker v. Turpin*, 101 F.3d 95, 97 (11th Cir. 1996) ("In light of overwhelming precedent, we conclude there is no merit in Plaintiff's claim that death by electrocution constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth

65

Amendments.") (citations omitted); *Sochor v. State*, 883 So. 2d 766, 789 (Fla. 2004).

Moreover, to the extent that Petitioner challenges execution by lethal injection, his claim also fails. The Supreme Court of Florida has consistently rejected claims challenging lethal injection as a method of execution. *See Lightbourne v. McCollum*, 969 So. 2d 326, 349-53 (Fla. 2007). Furthermore, in *Baze v. Rees*, 553 U.S. 35 (2008), the United States Supreme Court upheld a similar lethal injection scheme as not constituting cruel and unusual punishment. It was noted that revisions to Florida's lethal injection protocols provide additional safeguards to protect against unnecessary pain during execution. *See id.* at 120-21 (Ginsberg, J., dissenting) (noting Florida has adopted safeguards for protection by taking measures to assess an inmate's consciousness). As both execution by electrocution and lethal injection have been upheld, this claim is denied.

### K.   *Claim Fourteen*[15]

Petitioner contends that the state court erred in denying his Rule 3.851 claims (Doc. No. 49 at 71). Petitioner specifically states that the court erred in denying the following claims: (1) a claim of newly discovered evidence that Jeffrey received a life sentence; and (2) a claim of newly discovered evidence that Jeffrey had dominion and control over Petitioner.

### 1.   *Newly Discovered Evidence: Co-Defendant Received A Life Sentence*

Petitioner alleges that newly discovered evidence warrants a new penalty phase.

---

[15]Although the Court denies claim fourteen, as is noted, *infra*, the Court grants a certificate of appealability with respect to this claim, as jurists of reason could find it debatable that the denial of this claim was correct.

Specifically, Petitioner states that Jeffrey, who was "the actual killer," received a life sentence. *Id.* at 71. Petitioner maintains that had the jury known that the person who was more culpable received a life sentence instead of a death sentence, they would have sentenced him to life in prison as well. *Id.* at 71-72. Petitioner raised this claim in his Rule 3.851 motion (Ex. L-2). The trial court held an evidentiary hearing on this claim (Ex. L-1) and then denied the claim on the merits, noting that Petitioner's more severe sentence was not disproportionate because Jeffrey's life sentence was based on his age, which is a matter of law, and not on aggravating and mitigating circumstances. (Ex. L-3 at 480-81).

On appeal, the Supreme Court of Florida affirmed the lower court's denial of this claim. *Farina III*, 937 So. 2d at 618-20. The court found that Petitioner could not meet the test for newly discovered evidence. *Id.* at 619. The court stated that while this claim was raised within two years of discovering it, there is no reasonable probability that this evidence would produce an acquittal or life sentence because Jeffrey received a life sentence as a matter of law due to his age and not due to the lack of aggravating circumstances. *Id.* at 619-20.

The Court finds that the state court's denial of this claim is objectively reasonable. In Florida, to establish a claim of newly discovered evidence, one must present facts that were "unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known them by the use of diligence." *Scott v. Dugger*, 604 So. 2d 465, 468 (Fla. 1992) (quotation omitted). Moreover, the newly discovered evidence must be "of such nature that it would *probably* produce an

acquittal on retrial." *Id.* (citing *Jones v. State*, 591 So. 2d 911, 915 (Fla. 1991)) (emphasis in original). Jeffrey's life sentence was imposed on direct appeal after the Supreme Court of Florida determined that a sixteen year old could not be sentenced to death. *J. Farina II*, 763 So. 2d at 302. Jeffrey's life sentence could not have been known or discovered at the time of Petitioner's second penalty phase, or at any time prior to the Florida court's decision on July 13, 2000.

However, Petitioner cannot establish that this newly discovered evidence would probably result in a life sentence if a new penalty phase was granted. The Supreme Court of Florida has held that "the death penalty is disproportionate where a less culpable defendant receives death and a more culpable defendant receives life" *Jennings v. State*, 718 So. 2d 144, 153 (Fla. 1998) (citing *Hazen v. State*, 700 So. 2d 1207, 1211-14 (Fla. 1997)). In *Scott*, the Supreme Court of Florida vacated the petitioner's death sentence. The court noted that codefendant Robinson had received a life sentence upon remand for a new penalty phase. 604 So. 2d at 468. The court found that this newly discovered evidence would probably have produced an acquittal for Scott at the sentencing phase because both defendants were about the same age, had similar criminal records, had comparable IQ's, and were equally culpable. *Id.* Unlike the case in *Scott*, although Jeffrey was arguably the more culpable defendant because he was the triggerman, the Court notes that Jeffrey's life sentence was not decided by the penalty phase jury based on aggravating and mitigating circumstances. Jeffrey's life sentence was imposed as a matter of law because death sentences for minors are unconstitutional. *See Roper v. Simmons*, 543 U.S. 551 (2005).

Jeffrey's sentence has no connection to the nature and circumstances of the crime or his character.

The Supreme Court of Florida has reversed death sentences in several cases where the defendant was less culpable and his or her more culpable codefendant received a life sentence. *See Hazen v. State*, 700 So. 2d 1207, 1214-15 (Fla. 1997) (reversing Hazen's death sentence where codefendants Buffkin and Kormondy were the original instigators of the crime, Kormondy was the triggerman, and Hazen was just a "follower" who may not have known what "was going on" with respect to the murder that occurred in a different part of the house); *Puccio v. State*, 701 So. 2d 858, (Fla. 1997) (reversing Puccio's death sentence and determining the trial court's finding that Puccio was more culpable was not supported by competent substantial evidence where the evidence showed that Puccio played a lesser role in planning the killing and played no greater role than his codefendants in the actual killing); *Curtis v. State*, 685 So. 2d 1234 (Fla. 1996) (reversing a death sentence for seventeen year old defendant who did not fire fatal shot, noting "actual killer" codefendant received a life sentence); *Slater v. State*, 316 So. 2d 539 (Fla. 1975) (reversing defendant's death sentence where eleven jury members recommended a life sentence and the evidence demonstrated that Slater was an accomplice and his codefendant triggerman received a life sentence).

Unlike the cases where the Supreme Court of Florida has found a death sentence disproportionate to a codefendant's life sentence, in the instant case Jeffrey did not receive a life sentence due to plea negotiations or because the jury recommended life. As noted

*supra*, Jeffrey was sentenced to death but that sentence was overturned because, as a matter of law, he could not receive the death penalty. Moreover, although Petitioner was not the triggerman in the instant case, the Court notes that Petitioner was the original instigator and planner of the crime, unlike most of the defendants discussed in the above-mentioned cases.

Additionally, the Supreme Court of the United States in *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) concluded "that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (footnote omitted). The newly discovered evidence at issue in this case is not related to any aspect of Petitioner's character or record nor is it related to the circumstances of the offense. Petitioner argues that in a capital case a defendant has "a virtually unrestricted right to present any circumstance to a jury for consideration as a reason to spare his life" (Doc. No. 56 at 42). The Supreme Court of the United States, however, has not held that a criminal defendant is completely unrestricted in presenting evidence during the penalty phase of a capital murder case. Instead, the Court has held that a criminal defendant must meet a "low threshold for relevance, which is satisfied by evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Smith v. Texas*, 543 U.S. 37, 44 (2004) (quotation omitted); *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (holding a "sentencer in capital cases must be permitted

to consider any relevant mitigating factor" that takes into account the circumstances of the offense together with the character and propensities of the offender).

Although evidence of Jeffrey's life sentence does not prove or disprove a fact or circumstance of the instant case, it could arguably be deemed to have mitigating value to Petitioner's case. Regardless, even if the penalty phase jury had learned that Jeffrey had received a life sentence, they also would have been advised that the sentence was due only to his age and that the law requires a life sentence for a minor. In evaluating the newly discovered evidence along with the evidence presented at the penalty phase, the Court cannot conclude that this evidence would have probably produced a life sentence for Petitioner even though he arguably was "less culpable" because he was not the triggerman. There was evidence presented that Petitioner planned the robbery at the Taco Bell restaurant because he had worked there, knew the employees, and was familiar with the restaurant's procedures.

Moreover, the jury was presented with evidence that both Petitioner and Jeffrey purchased rope, gloves, and bullets on the day the robbery was committed. The surviving victims testified that both Petitioner and Jeffrey tied their hands behind their backs, assured them that they would not be hurt, appeared calm, and commanded them to enter the freezer, at which point Petitioner stated that they had one more precaution to take. Jeffrey then proceeded to shoot three of the four employees, and when his gun misfired, he stabbed the fourth employee. The jury also heard a taped conversation between Petitioner and Jeffrey in which Petitioner states that they should have "sliced" the victims' throats

and closed the freezer doors so that the victims could not exit the freezer.

Petitioner has not demonstrated how this newly discovered evidence would negate evidence presented during the penalty phase to such an extent that he would have received a life sentence instead of the death penalty. The jury recommended death by a vote of twelve to zero. In considering this newly discovered evidence along with the aggravating circumstances and the mitigating evidence that Petitioner was physically and sexually abused as a child, was abandoned by his father, was moved from town to town and different states numerous times during childhood and adolescence, was neglected, had a mother who forced her sons to steal for her, observed his mother drinking, doing drugs, cursing, and being with numerous boyfriends, and lived in poverty and in "filth," this Court does not find that the additional evidence would probably result in a life sentence instead of a death sentence.

Furthermore, the Court notes that it has not found, nor has Petitioner cited to, any cases in which the Supreme Court of the United States has held that a new penalty phase was warranted because the jury was entitled to hear evidence that a more culpable defendant received a life sentence as a matter of law due to his age at the time of the crime. The Supreme Court has rejected arguments that the Eighth Amendment requires proportionality between codefendants' sentences. *McCleskey v. Kemp*, 481 U.S. 279, 306-07 (1987). Petitioner has not demonstrated that the state court's determination was contrary to, or resulted in an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. Accordingly, this portion of claim

fourteen is denied pursuant to § 2254(d).

   2.   *Newly Discovered Evidence: Jeffrey's Dominion and Control over Petitioner*

In the second part of claim fourteen, Petitioner contends that newly discovered evidence demonstrates that Jeffrey had dominion and control over him (Doc. No. 49 at 71). Petitioner raised this claim in his Rule 3.851 motion for post-conviction relief (Ex. L-2). The trial court held an evidentiary hearing on this claim (Ex. L-1).

At the evidentiary hearing, Bill Hathaway ("Hathaway") stated that he represented Petitioner in 1998 for the second penalty phase hearing. *Id.* at 27-29. Hathaway tried to get Petitioner's case severed from Jeffrey's case, but the trial judge denied that request. *Id.* at 29. Hathaway testified that he felt Petitioner was the less culpable defendant in the case. *Id.* Hathaway wanted to call Jeffrey to testify but Jeffrey declined to do so because the cases were not severed. *Id.* at 30-31. Hathaway stated he tried to show that Jeffrey was in control and was the more violent and hot-tempered of the two defendants. *Id.* at 32. On cross-examination Hathaway affirmed that Petitioner was not forced to participate in the robbery and had in fact planned the robbery. *Id.* at 40.

 Susen Griffith ("Griffith"), the defendants' mother, testified that Petitioner was always more easygoing and a follower, whereas Jeffrey had a "short fuse." *Id.* at 43. Although Griffith states that neither son was aggressive, she testified that Jeffrey could get mad very easily and had punched doors and walls. *Id.* Griffith also testified that Jeffrey always appeared to be the leader of the two and Petitioner would rather go along with

Jeffrey than make him mad. *Id.* at 44. Griffith stated that Jeffrey owned a gun and knives but to her knowledge, Petitioner never owned any weapons. *Id.* at 45.

Katrina Bergenty ("Bergenty"), the defendants' younger sister, testified that she was eight years old when the crimes were committed. *Id.* at 50. Bergenty stated that both Petitioner and Jeffrey were always happy around her and that Petitioner was more laid back and Jeffrey had a shorter temper. *Id.* On cross-examination Bergenty admitted that while Petitioner was easygoing it did not mean that Jeffrey would force him to do things. *Id.* at 52. Tina O'Neill ("O'Neill"), a close family friend who has known the family for eighteen years, testified that she met Jeffrey when he started junior high. *Id.* at 54. She met Petitioner a year later because at that time he was not living with his mother but with family in Wisconsin. *Id.* at 55. O'Neill testified that she was closer to Jeffrey, who was sweet but had a dark side. *Id.* O'Neill stated that sometimes Jeffrey would get angry for no reason and would pick fights with Petitioner. *Id.* at 56. O'Neill was aware that Jeffrey would get suspended from school for fighting. *Id.* at 57. O'Neill testified that it appeared Jeffrey was the leader of himself and Petitioner even though he was younger. *Id.* at 58. On cross-examination O'Neill said that she had no qualms with allowing Jeffrey to watch her children. *Id.* at 71.

Jeffrey testified that he and Petitioner did not have a defined older brother-younger brother relationship. *Id.* at 75. Petitioner did not tell Jeffrey what to do. *Id.* Jeffrey stated that depending on the situation, either of them would make decisions. *Id.* at 75-76. Jeffrey stated that he helped Petitioner find a job at Park's Seafood, where he worked. *Id.* at 77.

Jeffrey also noted that if Petitioner had trouble or problems, he would talk to Jeffrey and Jeffrey would help him solve his problems. *Id.* Jeffrey testified that he did not remember how he became involved in Petitioner's plan to commit the robbery but did remember that they did not have defined roles. *Id.* at 83. Jeffrey stated that while they waited outside of the Taco Bell restaurant until closing time, Petitioner had indicated that he thought they should leave because they had no way to enter the building. *Id.* at 84. Jeffrey testified that he told Petitioner that they "came all this way" and he was not turning back without getting "anything" to show for it. *Id.* at 84-85.

Jeffrey testified that at that point in the crime, he felt he was in charge. *Id.* at 85. Jeffrey stated that Petitioner did most of the "talking" inside the Taco Bell because he knew the people and knew where the money was located. *Id.* at 85-86. Jeffrey testified that it was his decision to shoot the employees after Petitioner told him that the employees could identify him (Petitioner). *Id.* at 88. Jeffrey testified that even if Petitioner had wanted to stop him from shooting the employees, he would not have been able to do so. *Id.* Jeffrey also testified that Petitioner was behind him while he shot the employees in the freezer. *Id.* at 90. Moreover, Jeffrey stated that Petitioner never touched Gordon while he stabbed Gordon in the back of the head and back. *Id.* Jeffrey testified that when they left the Taco Bell, it was his decision to dispose of the rope, gloves, gun, and knife in the dumpster behind Park's Seafood. *Id.* at 91.

Jeffrey further testified that Petitioner's statement while they were seated in the police car that they should have "sliced" the victims' throats was not consistent with

Petitioner's personality. *Id.* at 93. Jeffrey admitted he was very violent at that time. *Id.* at 95. Additionally, Jeffrey stated that Petitioner was not the "mastermind" behind the crime. *Id.* On cross-examination Jeffrey testified that although he wants to help his brother, he will not lie for him. *Id.* at 97. Jeffrey admitted that Petitioner never told him not to shoot the employees. *Id.* at 103. Moreover, Jeffrey testified they never intended to shoot anyone and had brought a gun and purchased bullets in anticipation of needing the weapon for self-defense. *Id.* at 105.

Testimony of Dr. Clifford Levin ("Dr. Levin"), the psychologist who evaluated Petitioner, was also presented at the hearing. *Id.* at 121. Dr. Levin opined that Petitioner suffered from dependant personality disorder and antisocial personality disorder. *Id.* at 124. Dr. Levin did not have access to Jeffrey in 1992 or 1998 when he evaluated Petitioner. *Id.* at 126. Dr. Levin testified that he now had reviewed Dr. Krop's records relating to Jeffrey. *Id.* at 126-27. Dr. Krop found symptoms of organic brain impairment resulting from a head injury as a child and explosive personality disorder. *Id.* at 127. Jeffrey characterized himself as the leader and decisionmaker in his relationship with Petitioner. *Id.* at 128. Dr. Levin opined that based on Jeffrey's explosive personality and Petitioner's dependant personality, he could conclude that Jeffrey substantially dominated Petitioner. *Id.* at 131-32. On cross-examination, Dr. Levin testified that although Petitioner was diagnosed as having antisocial personality disorder, Petitioner "barely met" the criteria for this diagnosis and was really more of a dependant personality. *Id.* at 162.

The trial court denied this claim, finding that the testimony presented was not

entirely exculpatory (Ex. L-3 at 481). The court found the surviving victims' testimony at the 1998 penalty phase, in which they stated Petitioner was in charge, clearly contradicted this new evidence that Jeffrey was in control. The court determined that the victims' testimony was more credible. *Id.* at 481-82. The court concluded that the testimony presented at the evidentiary hearing was not credible because Jeffrey had a clear motive to fabricate or exaggerate now that he had received a life sentence, whereas there was no motive for the victims to contrive their testimony. *Id.* at 482. After weighing the evidence, the court determined that there was no probability that Petitioner would receive a life sentence if the jury heard this newly discovered evidence. *Id.* On appeal, the Supreme Court of Florida affirmed the denial of this claim. *Farina III*, 937 So. 2d at 623. The court held that competent substantial evidence supported the trial court's findings that the new evidence was incredible and would not have produced a recommendation of a life sentence upon retrial. *Id.*

Pursuant to section 921.141(6)(e) of the Florida Statutes, the fact that a defendant acted under "the substantial domination of another person" is a statutory mitigating circumstance. Although Petitioner presented newly discovered evidence to support a finding of this mitigating circumstance, the Florida courts found that the witnesses that testified at the post-conviction evidentiary hearing were not credible, and therefore their testimony would not support a finding of this mitigator. This Court must accept the state court's credibility determination. *See, e.g., Baldwin v. Johnson*, 152 F.3d 1304, 1316 (11th Cir. 1998) ("We must accept the state court's credibility determination and thus credit

[counsels'] testimony over [petitioner's].").  Additionally, the state court's factual findings are presumed correct, and Petitioner has not rebutted those findings by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Parker v. Head*, 244 F.3d 831, 835-36 (11th Cir. 2001).

Contrary to Petitioner's assertions, the state court did not unreasonably discount mitigation evidence but instead found the testimony was not credible.  *Cf. Porter v. McCollum*, 130 S.Ct. 447, 455 (2009) (finding that the Florida Supreme Court unreasonably discounted mitigation evidence produced at the post-conviction evidentiary hearing).  In *Porter*, there was no determination that the mitigation testimony was not credible.  Instead, the mitigation evidence was verified, but the trial court found that there was no reasonable probability that the mitigation evidence would have resulted in a life sentence instead of a death sentence.  *Id.* at 449-52.  The state trial court found that even with the additional verified or credible mitigation evidence, Porter would not have been able to establish any statutory mitigating circumstances.  *Id.* at 451-52.  In contrast to *Porter*, the state court here found that the additional mitigation evidence was not credible, and thus the statutory mitigator was not established.

Moreover, there is no indication that the state court erred in determining that Petitioner could not establish that Jeffrey had dominion and control over him.  Even if the jury had been presented this additional mitigation testimony, there is no reasonable probability that the jury would have found that Petitioner was under the dominion or control of Jeffrey.  In *Lawrence v. State*, 846 So. 2d 440, 449 (Fla. 2003), the Supreme Court

of Florida upheld the trial court's determination that the substantial domination mitigator was not established when there was no evidence that Lawrence's codefendant dominated him, threatened or coerced him, or intimidated him in any way. The court found that Lawrence planned the murder, purchased items to use during the murder, and assisted in concealing the victim's body. *Id.* Similar to *Lawrence*, here Petitioner planned the robbery and helped to purchase items to be used during the robbery. Although several family members testified that Jeffrey had a more dominant personality, there is no indication that Jeffrey coerced Petitioner into committing this crime.

In *Valdes v. State*, 626 So. 2d 1316, 1324 (Fla. 1993), the Supreme Court of Florida found that the trial court did not err in finding that the substantial domination mitigator was not established where Valdes participated in the crime, provided the murder weapon, and brought the victim to the back of the van where he was executed. As in *Valdes*, while Petitioner did not actually shoot the victims, he was the person that moved the victims from the general area of the store into the cooler, and then into the smaller freezer area, and noted that they had one last "precaution" to take.

Additionally, during the penalty phase, the three surviving victims testified that Petitioner appeared to be in control and was telling Jeffrey what to do (Ex. F-21 at 1268; Ex. F-22 at 1485; Ex. F-23 at 1543). Victim Gordon also testified that prior to making the employees enter the freezer, Petitioner stated that he had "one more precaution to take" (Ex. F-22 at 1488). Moreover, evidence was introduced that Petitioner planned the robbery two to three weeks before the crime was committed. Petitioner had previously worked at

the restaurant and knew the employees. Furthermore, while Dr. Levin testified during the penalty phase regarding Petitioner's dependant personality disorder (Ex. F-26), the jury also heard the taped conversation in which Petitioner stated that they should have sliced the victims' throats and shut the freezer door so as not to be caught. *Id.* at 2155. The Court cannot say that had the jury heard the less than credible testimony of Petitioner's brother, who now faces a life sentence instead of death, and his other family members, coupled with further explanation of Petitioner's mental health diagnosis, that there is a reasonable probability they would have found the existence of substantial control or dominion mitigator.

Petitioner has not demonstrated that the state court's determination was contrary to, or involved an unreasonable application of federal law, nor has he shown that the state court's denial of this claim resulted in an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, this part of claim fourteen is denied pursuant to § 2254(d).

### L.    *Claim Fifteen*

Petitioner claims that trial counsel was ineffective for failing to investigate and present evidence of Jeffrey's domination of him during the penalty phase proceedings (Doc. No. 49 at 83). Petitioner contends that counsel could have presented testimony regarding the fact that Jeffrey was more aggressive and the dominant brother despite their ages through other witnesses such as their mother and O'Neill. *Id.* at 84. Petitioner raised this claim in his Rule 3.851 motion (Ex. L-2). The trial court denied this claim, noting that

trial counsel's failure to call witnesses to testify as to Jeffrey's dominion and control over Petitioner did not result in prejudice because this testimony was found to be not credible (Ex. L-3 at 494).

On appeal, the Supreme Court of Florida found that Griffith and O'Neill's testimony was cumulative to that presented at the second penalty phase. *Farina III*, 937 So. 2d 612, 624. Moreover, the court stated that to the extent some of O'Neill's testimony was not cumulative, it stood in sharp contrast to the victims' testimony that Petitioner was in charge during the commission of the crime. *Id.* at 625. The court held that even if the jury found O'Neill's testimony to be credible, the additional mitigation evidence would not have outweighed the serious aggravating circumstances present in the case and that the jury would have unanimously recommended a death sentence. *Id.*

Although the state court found that Griffith and O'Neill's testimony regarding Jeffrey's domination was cumulative to the testimony presented during trial, this Court disagrees with that assessment. The testimony presented during the second penalty phase was general testimony regarding Petitioner and Jeffrey's upbringing and personalities. Tammy Lewis ("Lewis"), the mother of Petitioner's child, testified that Jeffrey was aggressive and had moments where he would "lose control" if he were under pressure (Ex. F-24 at 1733). However, Lewis also stated that Petitioner was the more level-headed of the two and would "try to take charge" of situations. *Id.* O'Neill testified that neither Jeffrey nor Petitioner had explosive tempers (Ex. F-25 at 1909). Nevertheless, neither O'Neill nor Griffith testified about Jeffrey dominating or controlling Petitioner.

Dr. Harry Krop, clinical psychologist, testified at the second penalty phase that he examined Jeffrey on four different occasions, and noted that Jeffrey suffered from organic brain damage after being involved in a car accident when he was five years old (Ex. F-26 at 2050, 2063). The brain damage may have contributed to changes in Jeffrey's personality in which he began suffering from anger and outbursts. *Id.* at 2064. Dr. Krop diagnosed Jeffrey with intermittent explosive disorder, which is an impulse control disorder. *Id.* at 2079. Dr. Krop also testified that Jeffrey told him that he and Petitioner discussed the possibility of having to shoot the victims. *Id.* at 2092. Petitioner and Jeffrey had discussed how they would handle the fact that some of the employees knew Petitioner, but they did not come up with a specific solution to the problem. *Id.* at 2093. There was no testimony regarding whether Jeffrey controlled or dominated Petitioner.

Additionally, Dr. Levin testified regarding Petitioner's dependant personality disorder and opined that Petitioner was immature, had extreme difficulty making decisions, had an extreme need for others to assume responsibility, was uncomfortable and helpless when alone, was not aggressive, and was not the type to initiate violence toward others (Ex. F-26 at 2123-26). Dr. Levin testified that although Petitioner had planned the robbery, he did not want to make any decisions regarding whether people would be murdered. *Id.* at 2141. Similar to the above testimony, Dr. Levin did not give an opinion as to whether Jeffrey was in control of or dominated Petitioner.

While defense counsel did not present mitigating evidence regarding Jeffrey's alleged domination over Petitioner, as the Court noted with respect to claim fourteen, the

trial court found that the testimony presented at the post-conviction evidentiary hearing was not credible. This Court has found that even if the jury had heard Griffith and O'Neill's testimony that Jeffrey was the dominant person in the relationship, there is not a reasonable probability that the jury would have found the existence of this mitigating circumstance, nor would the jury have found that this mitigating circumstance outweighed the aggravating circumstances present in the case. The jury unanimously recommended a death sentence. Furthermore, as noted previously, this new testimony tends to conflict with the testimony of the victims, who all stated that it appeared Petitioner, and not Jeffrey, was the person in charge during the robbery. Petitioner has not demonstrated that the state court's determination of this claim was contrary to, or resulted in an unreasonable application of, clearly established federal law. As such, this claim is denied pursuant to § 2254(d).

### M.    Claim Sixteen

Petitioner claims that Rule 4-3.5(d) of the Florida Rules of Professional Responsibility, which prevents trial attorneys from interviewing jurors, violates his constitutional rights pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments (Doc. No. 49 at 87-88). Petitioner contends that a defendant cannot determine if any juror misconduct occurred due to this rule. *Id.* Petitioner raised this claim in his Rule 3.851 motion for post-conviction relief (Ex. L-2). The trial court denied the claim, finding the claim was procedurally barred because it should have been raised on direct appeal (Ex. L-3 at 479). On appeal, the Supreme Court of Florida affirmed. *Farina III*, 937 So. 2d at 618 n.

4.

Because the instant claim should have been raised on direct appeal, it is procedurally barred. This procedural default will be excused only if Petitioner can show both cause for the default and actual prejudice resulting from the default. *See Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir.2003). To establish cause, "a petitioner must demonstrate that some objective factor external to the defense impeded [his] effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir.1999). To establish prejudice, a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different had the claim been presented. *Henderson*, 353 F.3d at 892 (internal citations omitted). The Supreme Court of the United States has held that a claim of ineffective assistance will support a finding of cause for a procedural default only if counsel's performance was "so ineffective as to violate the Federal Constitution." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). Thus, in order for ineffective assistance of counsel to serve as cause for Petitioner's procedural default, he must be able to satisfy the exacting standards of *Strickland*. *Brownlee v. Haley*, 306 F.3d 1043, 1066 (11th Cir.2002). If Petitioner "cannot prevail on a separate ineffective assistance of counsel claim, then he cannot prevail on an argument that ineffective assistance caused the procedural default." *Id.* Claims of ineffective assistance of appellate counsel are governed by the same standards applied to trial counsel under *Strickland*. *See Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991).

Petitioner raised a claim that appellate counsel was ineffective for failing to raise this

claim on direct appeal. However, the Supreme Court of Florida rejected Petitioner's ineffective assistance of appellate counsel claim, finding the claim was "clearly meritless" because it would not have been successful on appeal. *Farina III*, 937 So. 2d at 626. Petitioner has not presented any evidence or argument showing that the Florida Supreme Court's rejection of this claim is contrary to federal law.

Rule 4-3.5(d)(4) of the Rules Regulating the Florida Bar states, in relevant part, that "[a] lawyer shall not . . . after dismissal of the jury in a case with which the lawyer is connected, initiate communication with or cause another to initiate communication with any juror regarding the trial except to determine whether the verdict may be subject to legal challenge; provided, a lawyer may not interview jurors for this purpose unless the lawyer has reason to believe that grounds for such challenge may exist." Federal courts have held that "rules which prevent attorney interviews or other contact with jurors . . . have repeatedly been applied in criminal cases and held constitutional." *Cole v. Crosby*, No. 5:05-cv-222-Oc-10GRJ, 2006 WL 1169536, at *61 (M.D. Fla. May 3, 2006) (citing *Tanner v. United States*, 483 U.S. 107 (1987); *Sims v. Singletary*, 155 F.3d 1297, 1312-13 (11th Cir. 1998)); *Gudinas v. McNeil*, No. 2:06-cv-357-FtM-36DNF, 2010 WL 3835776, at *63 (M.D. Fla. Sept. 30, 2010); *Sireci v. Sec'y, Fla. Dep't of Corr.*, No. 6:02-cv-1160-Orl-35KRS, 2009 WL 651140, at *9 (M.D. Fla. Mar. 12, 2009).

Claim sixteen is procedurally barred from review because Petitioner's substantive argument is without merit. Thus, appellate counsel acted reasonably in not raising this argument on direct appeal and Petitioner has not established cause and prejudice to

overcome this procedural default. *See Owen v. Sec'y for Dep't of Corr.*, 568 F.3d. 894, 915 (11th Cir. 2009) (finding any deficiencies of counsel in failing to raise or adequately pursue an issue that lacks merit cannot constitute ineffective assistance of counsel); *Francois v. Wainwright*, 741 F.2d 1275, 1285 (11th Cir. 1984).

### N.    *Claim Seventeen*

Petitioner alleges that appellate counsel was ineffective for failing to argue on direct appeal a claim of prosecutorial misconduct (Doc. No. 49 at 90). Petitioner maintains that the prosecutor introduced evidence of "biblical command" or authority during his second penalty phase hearing. *Id.* Petitioner points to specific instances in which the prosecutor mentioned religion during voir dire, made Christianity and the victim's religious beliefs a major focus of the victim impact testimony, engaged in improper discussion with defense witness James Davis ("Davis") during cross-examination, and engaged in improper closing argument. *Id.* at 91-97.

Petitioner raised this claim in his state petition for writ of habeas corpus (Ex. P). The Supreme Court of Florida stated that to the extent Petitioner failed to raise specific objectionable errors to the prosecutor's improper comments during voir dire and the penalty phase, the claim was procedurally barred. *Farina III*, 937 So. 2d at 625 n. 8. The court addressed Petitioner's claim that appellate counsel should have raised the prosecutor's improper discussion of the Bible with defense witness Davis on the merits. *Id.* at 626. The court found that trial counsel failed to object to and obtain a ruling on the allegedly improper discussion that occurred during defense witness Davis' cross-

examination.  *Id.* at 628-29.  The court concluded that this claim was not preserved for appeal.  *Id.*  The court further held that the prosecutor's conduct did not amount to fundamental error.  *Id.* at 629-34.

In finding the prosecutor's conduct did not constitute fundamental error, the court reasoned that defense witness Davis had been a prison minister and first testified on direct examination and introduced religion into the proceedings.  *Id.* at 631. The court found that Davis did this by opining that Petitioner had a life-changing experience and had accepted God.  *Id.*  The court noted that Davis' testimony on direct examination "attempted to build a case for mitigation and dissuade the jury from recommending the death penalty" and in response the prosecutor attempted to reconcile Davis' religion with the death penalty.  *Id.*  Moreover, the court stated that the prosecutor's conduct was not so egregious because it occurred during cross-examination, a time when the believability and truth of a witness' testimony can be tested.  *Id.* at 632.  The court found that the prosecutor's comments were an attempt to discredit Davis'  testimony and illustrate that nothing prevented the jury from recommending the death penalty.  *Id.*  The court did note that the prosecutor's introduction of a Bible into the proceedings and request of the witness to read specific passages was improper.  However, given the fact that Davis was only one of 36 witnesses presented during the penalty phase and his testimony did not relate to an aggravating circumstance,  the court concluded that Davis' testimony did not affect the outcome of the jury verdict.  *Id.*

Petitioner's first portion of this claim, regarding appellate counsel's failure to argue

on appeal that the prosecutor engaged in improper discussion of the Bible during voir dire and with victim impact witnesses, was found to be conclusory by the state court. Petitioner did not cite to any portions of the record or instances of improper argument in his state habeas petition in order to support his claims (Ex. P). Thus, the state court's determination was essentially that the petition was facially insufficient. A state court finding of facial insufficiency constitutes an adequate and independent state ground precluding consideration of the claim. *See Aguilar v. Sec'y Dep't of Corr.*, No. 6:07-cv-101-Orl-31GJK, 2008 WL 5142411, at *4 (M.D. Fla. Dec. 5, 2008); *Dennis v. McDonough*, No. 3:04-cv-348, 2006 WL 3246611, at *11-12 (N.D. Fla. Nov. 8, 2006). "Federal courts are precluded from addressing claims that have been held to be procedurally defaulted under state law. In addition, the federal courts may not address claims that have not been presented in the state court if the state court would have found the claims to be procedurally defaulted." *Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993).

This procedural default will be excused only if Petitioner can show both cause for the default and actual prejudice resulting from the default. *See Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir.2003). To establish cause, "a petitioner must demonstrate that some objective factor external to the defense impeded [his] effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir.1999). To establish prejudice, a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different had the claim been presented. *Henderson*, 353 F.3d at 892 (internal citations omitted). Furthermore, Petitioner can excuse his procedural

default by demonstrating there has been a fundamental miscarriage of justice, which only "occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent. *Henderson*, 353 F.3d at 892.

Petitioner has not shown either cause or prejudice that would excuse the default, nor has he shown the applicability of the actual innocence exception.

With respect to Petitioner's claim that appellate counsel was ineffective for failing to argue on appeal the prosecutor engaged in improper discussion with witness Davis during cross-examination, the Court finds that Petitioner is not entitled to relief. Claims based on the statements of a prosecutor are assessed using a two-prong analysis: first, the court must determine whether the comments at issue were improper, and second, whether any comment found to be improper was so prejudicial as to render the entire trial fundamentally unfair. *Davis v. Kemp*, 829 F.2d 1522, 1526 (11th Cir. 1987). A trial is rendered fundamentally unfair if "there is a reasonable probability that, but for the prosecutor's offending remarks, the outcome . . . would have been different . . . . [A] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Williams v. Kemp*, 846 F.2d 1276, 1283 (11th Cir. 1988) (citations and quotations omitted); *see also Drake v. Kemp*, 762 F.2d 1449, 1458 (11th Cir. 1985).

During the penalty phase, Davis, an ordained minister at Stetson Baptist Church in DeLand, Florida, testified on behalf of Petitioner and Jeffrey that both had genuinely found and were committed to Christianity (Ex. F-24 at 1818-23). On cross-examination, the following question and answer exchange occurred between the prosecutor and witness

Davis:

Q.     You formed some pretty strong opinions about these young men. And I believe there's sincerely hell [sic]. I want to ask you, did you rely just upon your observations and experience, or did you put any thought or evaluation into how they stacked up according to the Bible?

A.     By the Bible's word, that and my emotions, because they were repentant to me for the crime that they had committed. And I saw signs of that in their actions and in their verbalization, and in their emotions, and in their feelings. And to me that's the way I can look at something and tell whether it's what it says it is, if it appears to be that, you know.

Q.     But as a man of God, you certainly don't make real serious judgments or considerations without holding up your opinion to maybe God's standard and his word? Is that part of --

A.     I'm definitely not God.

Q.     What I'm asking you is you put heaving reliance upon the Bible, don't you?

A.     Yes, I do.

Q.     What is the Bible to you?

A.     It's the infallible word of God, inspired word of God that God gave to us as our -- for lack of words, it would be like our instruction manual for life to where we can live by. Like when you buy a car and you can't figure out how to work a gadget in the car, you get the instruction manual. That's what the Bible is, too. It shows us instruction on how we need to live and what we need to do.

Q.     But from my understanding of the Bible, is men [sic] actually wrote the words down and you say it's the word of God?

A.     Inspired by the Holy Spirit, right.

Q.     Are you familiar with the book of Romans? Do you know who wrote

it?

A.     Paul, Apostle Paul.

Q.     What happened to Paul ultimately?

A.     Paul was killed ultimately.

Q.     By the Roman government?

A.     Uh-huh.

Q.     For refusing to renounce Christ?

A.     That's right.

Q.     But not for any other crime?

A.     Right.

Q.     And even though Paul was a prisoner of the Roman government, he wrote a very significant book called the Romans [sic]; did he not?

A.     Yes, he did.

Q.     Are you familiar with the first seven verses of Romans thirteen?

A.     Yes.  About honoring authority, submitting to authority.  The judge and the prosecutor and the defense attorneys all work for God and are ordained by God as being the authority and in the positions that they are and if they -- God is the one that allows them to be there.

Q.     Well, I don't want to say that defense attorneys aren't saved.  But they're not the authorities, are they, they are defense lawyers versus the prosecutor?

A.     Right.

                                    . . .

Q.     What does Romans one and two say about authority under God's

law?

MR. HATHAWAY: Perhaps he can show the relevancy of this. I don't know why we are referring to this at this time.

THE COURT:        What --

MR. HATHAWAY: Relevance objection.

MR. TANNER:      You Honor [sic], I will link it up when I lay the foundation. I believe you will see the relevancy as we –

THE COURT:        To this witness' testimony, not just a philosophical or religious discussion?

MR. TANNER:      No, sir.

THE COURT:        This is specific testimony?

MR. TANNER:      Yes, it will relate directly to this witness' testimony.

THE COURT:        Connect it up. And, Mr. Hathaway, if it's not properly connected up, go ahead and renew your objection.

THE WITNESS:     Read verse one and two?

MR. TANNER:      Yes, sir.

A.      Everyone must submit himself to the governor of authorities for there is no authority except for which God has established. The authorities that exist have been established by God. Consequently, he who rebels against the authority is rebelling against what God has instituted. And those who do so will bring judgment on themselves.

Q.      The next verse deals with the prosecutor; does it not? What does it say?

A.      For the rulers hold no terror for those who do right, but for those who do wrong. Do you want to be free from fear that the one in authority and do what is right and you will -- jumps over here -- he will

commend you [sic].

Q.    And the next verse?

A.    Where he is God's servant to do your good, but if you do wrong, be afraid for he does not bear the sword for nothing.  He is God's servant and agent to wrath, to bring punishment to the wrongdoer.

Q.    And the next?

A.    Therefore, it is necessary to submit to the authorities not only because of the possible punishment, but also because of your conscience.

. . .

Q.    Is there anything in scripture that you find that says the laws and the government should excuse crimes because someone is repentant?

A.    Specifically the law and government, no.

Q.    Tells us Christians forgive one another?

A.    Yes.

Q.    But that's not inconsistent with the government's responsibility to uphold the law and bring the punishment which -- and the word of the Lord, that you have just read, that bring judgment on themselves; is that correct?

A.    That's correct.

Q.    Do you believe there's anything in what you have taught these young men or heard from them that you are telling them that the law should forgive them because they have become Christians, the law?

A.    No.  Matter of fact, I tell everyone when I preach to them that God will forgive you for anything that you do, but the state of Florida is not, because they are going to remember it for the rest of your life.  It's going to be on your wrap sheet.

Q.    Well, in fact, we have an even better example than that, when Christ

was on the cross there was a condemned felon beside him that repented and accepted Christ; is that right?

A.    That's right.

Q.    But he didn't take that felon off the cross or forgive the death penalty, did he?

A.    No.

Q.    He said he would see him in paradise?

A.    Yeah.

(F-24 at 1836-1842).  On re-cross examination, the prosecutor further questioned Davis as follows:

Q.    Christ died for sinners?

A.    Yes.

Q.    And Paul died because of Christ?

A.    Yes.

Q.    Is there anything inconsistent with that, that these men face the death penalty for the murder of a seventeen-year-old girl?

A.    No.

*Id.* at 1845.

Defense counsel did not object to this line of questioning.  Therefore, the issue of whether the prosecutor improperly engaged in a religious discussion with witness Davis was not preserved for appeal.  In Florida, to preserve an issue for appeal, a party must make a contemporaneous objection which states the legal ground for the objection and

must obtain a ruling on that objection. *Harrell v. State*, 894 So. 2d 935, 940 (Fla. 2005) (citing *Steinhorst v. State*, 412 So. 2d 332, 338 (Fla. 1982)); *Armstrong v. State*, 642 So. 2d 730, 740 (Fla. 1994). While defense counsel objected, the objection was to the relevance of the discussion regarding the Bible, and the trial court did not rule on the objection, told the prosecutor to connect the discussion with Davis' testimony on direct examination, and advised defense counsel to object again if the relevance was not established. Even if the objection made could be considered to have sufficiently preserved the issue, defense counsel did not object on the grounds now asserted, prosecutorial misconduct for introducing evidence of biblical command and authority during the proceeding. Accordingly, in order to be considered on appeal, this claim had to amount to fundamental error. *Harrell*, 894 So. 2d at 941 (the sole exception to the contemporaneous objection requirement is fundamental error).

In Florida, courts apply the fundamental error doctrine only rarely. *Smith v. State*, 521 So. 2d 106, 108 (Fla. 1988) (warning that "[t]he doctrine of fundamental error should be applied only in rare cases where a jurisdictional error appears or where the interests of justice present a compelling demand for its application"). In order to be considered a fundamental error, the error must "'reach down into the validity of the trial itself to the extent that the verdict of guilty could not have been obtained without the assistance of the alleged error.'" *Harrell*, 894 So. 2d at 941 (quoting *Brown v. State*, 124 So. 2d 481, 484 (Fla. 1960)). Prosecutorial misconduct "constitutes fundamental error when, but for the misconduct, the jury could not have reached the verdict it did." *Miller v. State*, 782 So. 2d 426, 432 (Fla. 2d DCA 2001) (citing *Kilgore v. State*, 688 So. 2d 895, 898 (Fla. 1996)).

In *Romine v. Head*, 253 F.3d 1349, 1359, 1368-69 (11th Cir. 2001), the Eleventh Circuit Court of Appeals held that the prosecutor's extensive closing arguments to the jury about how Biblical law could be used to "eschew any consideration of mercy and sentence Romine to death" were improper and as such, a new sentencing proceeding was warranted because there was a reasonable probability that without the improper argument the jury would not have recommended a death sentence. The court noted that during the penalty phase, religion "permeated virtually every aspect of the resentencing trial" because (1) there was "extensive evidence about religion" admitted in the form of Romine's religious upbringing, (2) the jury was sequestered in a Baptist assembly, (3) the trial judge made a suggestion that the jurors be made to listen to a sermon, and (4) the prosecutor in his closing argument "gave the jurors a hell fire and brimstone mini-sermon the effect of which was to tell them that regardless of the law of Georgia, they ought to follow the law of God, as the prosecutor interpreted it" which ruled out any consideration of mercy. *Id.*

In contrast to *Romine*, the Eleventh Circuit recently affirmed the denial of a similar claim in *Shere v. Sec'y, Fla. Dep't of Corr.*, 537 F.3d 1304, 1311 (11th Cir. 2008). The *Shere* court noted that what was problematic in *Romine* was the prosecutor's closing arguments to the jury where he "unilaterally advanced Bible arguments" to "convince the jury the Bible required the death penalty." *Id.* The court distinguished Shere's trial, in which the prosecutor asked Biblically-related questions during cross-examination of a defense witness, and concluded "there is nothing inherently problematic with a prosecutor's asking religious questions while cross-examining defense witnesses who were put on the stand

to testify about a capital defendant's religion, so long as the cross-examination does not exceed the scope of the religious subject matter explored on direct." *Id.* The Eleventh Circuit concluded that Shere "injected religion into the proceedings when he called witnesses to establish a mitigation defense based in part on religion, and he asked them fairly searching questions aimed at highlighting his religious beliefs and practices." *Id.* The court found that it was within the prosecutor's authority to test the defense of religion during cross-examination. *Id.*

Similar to *Shere*, in the instant case the prosecutor's discussion of the Bible and the passages from Romans occurred during cross-examination, after Petitioner had questioned Davis about his knowledge of Petitioner's religious beliefs and whether they were sincerely held. The prosecutor did not mention or argue religion in his closing argument. Petitioner essentially injected religion into the proceedings by calling this witness to establish a mitigation defense based in part on his sincerely held religious beliefs. There is no indication that the cross-examination exceeded the scope of the religious matter explored on direct where defense counsel asked searching questions that highlighted Petitioner's religious beliefs and practices. For example, on direct examination Davis testified that he visited Petitioner once a month for an hour, and during that time had many in-depth talks with him about his life and religion (Ex. F-24 at 1822-24). Davis noted that Petitioner used and read the Bible that Davis had given him and would write out questions regarding things he had read so that he could discuss it with the pastor. *Id.* at 1825. Moreover, defense counsel Henderson, Jeffrey's attorney, asked additional questions about inmates

finding religion and times when inmates have lied about their religious beliefs. *Id.* at 1832-36.

Although in the instant case religion was raised in other parts of the penalty phase, it did not "permeate virtually every aspect of the resentencing trial" like in *Romine.* 253 F.3d at 1368-69. The State presented victim impact evidence which portrayed Michelle Van Ness as a religious person. Furthermore, many of her family members spoke of her religious nature. However, unlike *Romine*, the jury was not sequestered in a church, there were no remarks made by the trial judge to the jurors about religion, and the prosecutor did not make his closing argument a mini-sermon about religion.

The Court finds this case is more akin to *Shere* and concludes that there is nothing inherently problematic with the prosecutor's questioning of Davis when Petitioner made religion and his religious beliefs an issue by calling this witness. Because the prosecutor's questioning on cross-examination did not amount to error, the Court finds that there is not a reasonable probability that but for the prosecutor's remarks that the outcome of the penalty phase proceeding would have been different or that the remarks had a substantial and injurious effect on the jury. *Brecht v. v. Abrahamson*, 507 U.S. 619, 622 (1993). Petitioner has not demonstrated that fundamental error occurred with respect to this claim. Therefore, appellate counsel did not act deficiently in failing to raise this claim on direct appeal. The state court's determination of this claim was not contrary to, or an unreasonable application of, clearly established federal law. As such, the instant claim is denied pursuant to § 2254(d).

*O.*    *Claim Eighteen*

Petitioner contends that appellate counsel was ineffective for failing to raise a claim on direct appeal that the substance of the victim impact evidence was improper (Doc. No. 49 at 99).  Petitioner acknowledges that appellate counsel challenged the victim impact evidence on appeal but asserts that counsel did not challenge the substance of the testimony as improper pursuant to *Payne v. Tennessee*, 501 U.S. 808 (1991), and merely challenged the admissibility of the testimony in general (Doc. No. 56 at 66-67).  Petitioner also argues that appellate counsel's concession at oral argument that the substance of the victim impact statements was not objectionable violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights (Doc. No. 49 at 99).  Petitioner raised this claim in his state habeas corpus petition filed with the Supreme Court of Florida (Ex. P).  The court found that this claim was conclusory and therefore insufficient to state a viable ground for relief. *Farina III*, 937 So. 2d at 625 n. 8.

Respondents argue that the instant claim is procedurally barred.  This Court will not consider a claim if it was presented to the state court and rejected on independent and adequate state grounds of procedural bar or default.  *Coleman v. Thompson*, 501 U.S. 722, 734-35 (1991); *Caniff v. Moore*, 269 F.3d 1245, 1247 (11th Cir. 2001).  Although the Supreme Court of Florida found the claim insufficiently pled and therefore did not consider the merits of the claim, this Court finds that Petitioner's claim was sufficiently pled in the state court and thus, the procedural bar was not adequate.  *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001) (finding a state court's procedural ruling is independent and adequate if

(1) the last state court judgment clearly and expressly states that it is relying on state procedural rules to resolve the federal claim; (2) the state court's decision rests solidly on state law grounds; and (3) the state rule is not applied in an arbitrary or unprecedented fashion) (internal quotes and citations omitted).

Petitioner's claim in the state court alleged that appellate counsel was ineffective for failing to raise on appeal that the substance of the victim impact evidence violated *Payne* (Ex. P). Petitioner specifically cited to several portions of the victim impact testimony that he alleged was improper because the testimony was not of the substance allowed by the Court in *Payne*. *Id.* There is no indication that Petitioner's claim was insufficiently pled. Because the state court procedural bar was not adequate, this Court will address the merits of Petitioner's claim. However, the Court finds that Petitioner is not entitled to relief on this claim.

The *Payne* Court held that "evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." 501 U.S. at 827. The Supreme Court did not specifically hold that victim impact evidence of a certain type or substance was admissible, but as noted *infra*, the Court found that if victim impact evidence is "so unduly prejudicial that it renders the trial fundamentally unfair," habeas relief may be warranted. *Id.* at 825. Several circuits have held that victim impact testimony from family members and non-family members is admissible. *See Whitten*, 610 F.3d at 188; *Bolden*, 545 F.3d at 625; *Fields*, 516 F.3d at 946; *Bernard*, 299 F.3d at 478. The testimony in this case consisted of statements

made by the victim's friends, teacher, former boyfriend, and various family members. Petitioner has cited to no United States Supreme Court precedent which prohibits the type of testimony given in this case. Moreover, this Court has determined that Petitioner has failed to demonstrate that the victim impact testimony unduly prejudiced the outcome of the penalty phase.

Petitioner has not shown that appellate counsel was ineffective for failing to raise this claim on direct appeal as there is no indication that it would have been meritorious. *Owen*, 568 F.3d. at 915; *Francois*, 741 F.2d at 1285. Petitioner has not met his burden of demonstrating that the state court's denial of this claim was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. Accordingly, claim eighteen is denied pursuant to § 2254(d).

### P.      *Claim Nineteen*

Petitioner argues that appellate counsel was ineffective for failing to argue on appeal that the State committed prosecutorial misconduct when it misstated the law and facts during closing arguments in the second penalty phase hearing (Doc. No. 49 at 104). Petitioner cites to six instances of alleged prosecutorial misconduct to support his claim. *Id.* at 104-08. Petitioner raised the instant claim in his state habeas petition filed with the Supreme Court of Florida (Ex. P). The Court found that the instant ground was conclusory and failed to state a sufficient claim. *Farina III*, 937 So. 2d at 625 n.8.

Similar to ground eighteen, Respondents argue that this claim is procedurally barred because it was insufficiently pled in the state court. However, there is no indication that

this claim was insufficiently pled or conclusory because Petitioner cited to the specific portions of closing argument that were allegedly improper in his state habeas petition (Ex. P at 39-44). Petitioner also argued that appellate counsel's failure to raise these arguments on direct appeal resulted in prejudice. *Id.* at 45-46. The state court's procedural bar was not an adequate and independent state ground of procedural default, therefore, the Court declines to impose the procedural bar and will address the claim on the merits. *See Coleman*, 501 U.S. at 734-35; *Caniff*, 269 F.3d at 1247; *Judd*, 250 F.3d at 1313.

With respect to claims based on the statements of a prosecutor, the Court must determine whether the comments at issue were improper, and second, whether any comment found to be improper was so prejudicial as to render the entire trial fundamentally unfair. *Davis*, 829 F.2d at 1526. A trial is rendered fundamentally unfair if "there is a reasonable probability that, but for the prosecutor's offending remarks, the outcome . . . would have been different . . . . [A] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Williams*, 846 F.2d at 1283.

### 1.    *Improper Comment on Burden of Proof*

Petitioner first points to the prosecutor's comments during closing arguments regarding the State's burden of proof. The prosecutor told the jury the following:

> The State has the burden of proof in this case, as it does in every criminal case, and our burden is to prove beyond a reasonable doubt that aggravating factors in this case have been proven. Now, your duty is not proof you should make a certain recommendation [sic]. Our burden is not to prove beyond a reasonable doubt that these young men should be sentenced to death.

(Ex. F-28 at 2348-49).  Defense counsel objected to this comment.  *Id.* at 2349.  The trial court stated that it was giving the attorneys "some leeway in paraphrasing the [jury] instructions." *Id.*  The trial court further stated, "If the paraphrasing gets to a point of being erroneous and misleading, I'll sustain the objection; but I don't think I'm going to -- I'm not going to require counsel to simply quote the instructions." *Id.*  The prosecutor continued, stating, "The burden of proof upon the State is to prove beyond a reasonable doubt each aggravating factor that we believe will support a recommendation by you of the death penalty." *Id.* at 2350.

While the prosecutor's comment may have at first appeared to improperly shift the burden of proof, after defense counsel objected, the State then corrected itself and noted that each aggravating factor had to be proven beyond a reasonable doubt.  *See* Fla. Std. Jury Inst. (Crim.) § 7.11 (stating that aggravating circumstances must be proven beyond a reasonable doubt before it can be considered by the jury in arriving at its recommendation). Moreover, the trial court instructed the jury, prior to closing arguments, that the statements made by the attorneys were not evidence or instruction on the law (Ex. F-28 at 2347).  The trial court further stated that the jury was to rely on its own recollection of the evidence presented.  *Id.*  Additionally, after closing arguments, the trial court specifically instructed the jury that each aggravating circumstance had to be proved beyond a reasonable doubt before the jury could consider such a factor.  *Id.* at 2406.  Therefore, there is no indication that the initial improper comment impermissibly shifted the burden of proof in this case. *See Adams v. Wainwright*, 709 F.2d 1443, 1447 (11th Cir. 1983) (a jury is presumed to follow

jury instructions). Thus, appellate counsel was not deficient for failing to raise this claim

on direct appeal because the claim would not have been meritorious. *Owen*, 568 F.3d. at

915; *Francois*, 741 F.2d at 1285. Petitioner has not shown that the state court's determination

was objectively unreasonable. Accordingly, this portion of claim nineteen is denied

pursuant to § 2254(d).

### 2. *Improper Comments Regarding Mental Health Mitigator*

Petitioner next contends that appellate counsel failed to argue on appeal that the

prosecutor made improper comments regarding the mitigating circumstances at issue in

this case. Petitioner specifically points to the prosecutor's comment in which he stated:

> We have another recognized mitigator, and that is if the defendants were
> under extreme mental or emotional disturbance. There was no testimony of
> that. In fact, each of the psychologists said each of the defendants knew what
> they were doing, were competent and sane, and had no significant mental
> disorder to be classifiable as an extreme or mental or emotional disturbance.

(Ex. F-28 at 2358). Defense counsel objected, the trial court sustained the objection and

asked the State to clarify that the issue was not whether the defendants were insane at the

time of the offense. *Id.* The prosecutor then told the jury:

> Sanity is not an issue. If either of the psychologists found these men were
> insane, either now or at the time of the crime, there would be an insanity
> defense imposed and that's not an issue. What is an issue is whether or not
> there was extreme mental or emotional disturbance which you think carries
> enough weight to outweigh the aggravators.

*Id.* at 2358-59.

The Court finds that Petitioner has not demonstrated that he is entitled to relief with

respect to this claim. Even if the prosecutor's initial comments regarding sanity were

improper, the trial court sustained the objection and asked the State to revise its comments. The State then advised the jury that sanity was not an issue and at issue was whether the crimes were committed while the defendants were under the influence of an extreme mental or emotional disturbance. *See* Fla. Std. Jury Inst. (Crim.) § 7.11. "Extreme mental or emotional disturbance" is not defined by the Florida Statutes. Fla. Stat. § 921.141(6)(b). The prosecutor fairly commented on the evidence presented and opined that the defendants had no significant mental disorders that would fall under the extreme mental or emotional disturbance category. The prosecutor's mere mention that the defendants were sane, and subsequent correction to note sanity was not an issue in the case did not prejudice the outcome of the penalty phase.

Petitioner has not demonstrated that appellate counsel acted deficiently in failing to argue this claim on direct appeal because the claim would not have been meritorious. The state court's determination of this claim was not contrary to, or an unreasonable application of, clearly established federal law. As such, this claim is denied pursuant to § 2254(d).

### 3. *Improper Characterization of the Evidence*

Petitioner next points to the prosecutor's comments with respect to what Petitioner said about his brother's stabbing of victim Gordon. During closing arguments, the prosecutor stated: "We have the words of Anthony. As he's explaining to Jeffrey in the back to the car [sic] he [Jeffrey] said, I thought Michelle was going to die. He [Anthony] says no. He didn't get the knife in deep enough" (Ex. F-28 at 2360-61). Defense counsel

objected to this claim, stating that it was not an accurate quote of the taped conversation that occurred between Petitioner and his brother. *Id.* The Court noted that it had instructed the jury to rely upon their own recollection of the evidence. *Id.* The prosecutor then told the jury that they would have the tape of the conversation to listen to so that they could view the exact words that were spoken between the defendants. *Id.*

Petitioner also argues that the prosecutor later again improperly characterized the evidence when he stated, "Jeffrey and Anthony discussed, again, killing people, and Anthony knew." *Id.* at 2365. Defense counsel objected to this statement, and the prosecutor told the trial court that he would reword his statement. *Id.* The State then told the jury that the defendants discussed carrying out a robbery of Taco Bell. *Id.*

Although defense counsel argued that the State improperly recounted the conversation between the defendants and what they had planned prior to the commission of the robbery, the State and trial court both instructed the jury that it was to rely on its own recollection of what occurred during the taped conversation. Moreover, the jury had the tape of defendants' conversation while deliberating, so if there was any question as to what Petitioner said regarding his brother's attempts to stab victim Gordon or what the two had planned prior to entering the Taco Bell restaurant, the jury could listen to the conversation again. Even if the prosecutor's comments were improper, there is no indication that these comments were so prejudicial as to render the entire penalty phase unfair. The Court finds appellate counsel did not act deficiently in failing to raise this claim on direct appeal because it would not have been meritorious. Petitioner has not met his

burden of proving that the state court's determination of this claim was contrary to, or resulted in an unreasonable application of, clearly established federal law. Accordingly, this claim is denied pursuant to § 2254(d).

**4.      *Impermissible Prosecutorial Expertise Argument***

Petitioner alleges that the State engaged in improper argument relating to the prosecutor's expertise. Petitioner cites to the following comment as improper:

> Even in a case that it appears right off the bat, so to speak, that surely this is a death penalty case, we go through a very laborsome process and we should. It's an orderly process of first conviction beyond a reasonable doubt, and then the requirements that the State go even further and prove one or more aggravating circumstance[s]. It would support the death penalty, and the legislature is even limited to what we can -- what would be aggravating circumstances. And to prove two, that it's mostly related, you will only get credit for one. So there's a real control over this.

> This state doesn't ask jurors to come in and rule on their emotions. Rule upon, well, I just think it ought to go this way, and a very orderly process followed and that process in this case is the weighing process that will result in a recommendation by you that is just and is the right thing to do.

(Ex. F-28 at 2364-65). Trial counsel did not object to these comments as improper.

Generally, the failure to raise a contemporaneous objection when improper closing arguments are made waives any claim concerning the comments for appellate review. *Brooks v. State*, 762 So. 2d 879, 898 (Fla. 2002) (citations omitted). "The sole exception to the general rule is where the unobjected-to comments rise to the level of fundamental error, which has been defined as error that 'reaches down into the validity of the trial itself to the extent that verdict of guilty could not have been obtained without the assistance of the

alleged error.'" *Id.* (quoting *McDonald v. State*, 743 So. 2d 501, 505 (Fla. 1999)).

The unobjected-to comments in this case do not rise to the level of fundamental error. In *Brooks*, the Supreme Court of Florida found that the prosecutor's use of "prosecutorial expertise" arguments were improper because they tended to "cloak the State's case with legitimacy as a bona-fide death penalty prosecution, much like an improper 'vouching' argument." *Id.* at 902 (citing *Gorby v. State*, 630 So. 2d 544, 547 (Fla. 1993)). In the *Brooks* case, the prosecution stated that it did not seek the death penalty in all cases, only cases where the "death penalty weighing test" is met. *Id.* at 901. The prosecutor used an example of when the death penalty weighing test was not met, such as in a case where a 16-year-old getaway driver was on trial for murders committed by a 30-year-old ex-convict trigger man. *Id.* The prosecutor further told the jury that it was clear that the death penalty test had been met. *Id.*

Unlike *Brooks*, in the instant case the prosecutor did not engage in prosecutorial vouching or comments on its expertise. Instead the prosecutor engaged in a discussion of how the State had to prove one or more aggravating circumstances in order to sentence a person to death instead of merely relying on jurors' emotions. The State did not argue any sort of "death penalty weighing test," wherein the death penalty in this case was warranted because Petitioner was a bad person or the facts justified such a result. Instead, the State merely was setting forth the death penalty weighing process for the jury. The *Brooks* court noted that it did not condemn a prosecutor's use of a hypothetical example to explain the death penalty weighing process and only found such argument improper in connection

with comments about the State's decision to seek the death penalty.  *Id.* at 902 n. 32.  Unlike the prosecutor in *Brooks,* the prosecutor here did not make his comments about the death penalty weighing process in connection with the reasons why the State pursued the death penalty in the instant case.  Petitioner has not demonstrated that the prosecutor's comments amounted to fundamental error, therefore, appellate counsel was not deficient for failing to raise this issue on appeal because it was not preserved for review.

The state court's determination of this claim was not contrary to, nor did it result in an unreasonable application of, clearly established federal law.  As such, this claim is denied pursuant to § 2254(d).

### 5.      *Improper Comment Regarding Age Mitigator*

Petitioner next asserts that the State made improper comments regarding Petitioner's age and relative maturity.  The prosecutor stated the following: "The immaturity you may want to ascribe to people below 20 years old does not mitigate what these two men determined to do and what they carried out" (Ex. F-28 at 2366).  Defense counsel did not object to this comment, therefore, appellate counsel would not be ineffective for failing to raise this claim on direct appeal unless the comment rises to the level of fundamental error.

A penalty phase jury may consider the age of the defendant as a mitigating factor.  Fla. Stat. § 921.141(6)(g). The Court finds that the prosecutor's comments were not improper; the State did not tell the jury that they could not consider Petitioner's age as a mitigating circumstance, instead the prosecutor opined that Petitioner's age and

immaturity did not outweigh the aggravating circumstances in this case. Moreover, the trial court instructed the jury that they could consider Petitioner's age as a mitigating circumstance (Ex. F-28 at 2405); *see Adams v. Wainwright*, 709 F.2d 1443, 1447 (11th Cir. 1983) (a jury is presumed to follow jury instructions). Finally, the Court notes that the trial court found Petitioner's age was a mitigating circumstance in this case. Petitioner has not demonstrated that the prosecutor's comments regarding how the jury should weigh Petitioner's age against the facts of the case and aggravating circumstances prejudiced the outcome of the penalty phase. Petitioner has not shown that this claim amounts to fundamental error. Thus, appellate counsel was not ineffective for failing to raise an unpreserved claim on appeal.

The Court finds that the state court's determination of this claim was not contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. Accordingly, this claim is denied pursuant to § 2254 (d).

### 6.    *Improper Religious Arguments*

Petitioner contends that the State engaged in improper argument when it made the following comment: "They [defendants] have brought this judgment upon themselves by their choices, and your recommendation to this Court should be a recommendation that they pay the ultimate penalty for their crimes." (Ex. F-28 at 2366). Petitioner asserts that this comment amounts to the use of Biblical authority as a basis for a death sentence (Doc. No. 56 at 69). Defense counsel did not object to this statement, therefore, appellate counsel did not act deficiently in failing to raise this claim unless it amounts to fundamental error.

The Supreme Court of Florida denied this claim on the merits, stating that although the prosecutor's statement could be seen as similar to a line that he earlier read from the Book of Romans during the cross-examination of Davis, there was no indication that the "jury successfully linked these phrases to the verses read . . . the day before . . . ." *Farina III*, 937 So. 2d at 634-35. The court found that because the comment was not an obvious reference to God or religion, the comment did not constitute fundamental error. *Id.* (citing *Lugo v. State*, 845 So. 2d 74, 110 (Fla. 2003); *Lawrence v. State*, 691 So. 2d 1068, 1074 (Fla. 1997); *Ferrell v. State*, 686 So. 2d 1324, 1327 (Fla. 1996); *Street v. State*, 636 So. 2d 1297, 1303 (Fla. 1994)).

This Court agrees that the statement made by the prosecutor did not amount to fundamental error. The prosecutor did not mention God or religion during his closing argument. In *Lugo*, the court found the prosecutor's arguments that the jury should not give the defendant mercy and that in any society or religion, the defendant's case was the worst were harmless error. 845 So. 2d at 110. In *Lawrence*, the prosecutor made a comment during closing arguments that equated the jury's sentencing to "God's judgment of the wicked." 691 So. 2d at 1074. The Supreme Court of Florida found those comments, while improper, did not amount to fundamental error. *Id.*

Similarly, in *Ferrell*, the Supreme Court of Florida addressed a prosecutor's comment regarding the origins of the Christian commandment, "Thou shalt not kill." 686 So. 2d at 1327. The court stated that it was without question that "trial judges and attorneys should refrain from discussing religious philosophy in court proceedings." *Id.* The court

concluded that the statement did not amount to fundamental error because the comment was brief and harmless when viewed in light of the entire record.  Finally, in *Street*, the court found that several biblical references made by the prosecutor, such as "should we excuse the sinner? Should we thank the sinner? Is that our job; is that our obligation under law?" did not amount to fundamental error.  636 So. 2d at 1303.

Unlike the above-cited cases, the comment made by the prosecutor in the instant case made no reference to God, religion, any Biblical commandments or sinners.  The State's comment merely asked the jury to sentence the defendants to death because their conduct warranted such a penalty.  There is no indication that this comment was meant to invoke religion or that the jury would have referred back to the comments made on the previous day when the State questioned Davis about religion. Because the comment does not amount to fundamental error, appellate counsel was not deficient for failing to argue this claim on direct appeal.  As such, the state court's determination of this claim is not contrary to, or an unreasonable application of clearly established federal law.  This portion of claim nineteen is denied pursuant to § 2254(d).

Q.     *Claim Twenty*

Petitioner claims that his sentence is unconstitutional pursuant to *Roper v. Simmons*, 543 U.S. 551 (2005), and thus violates his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.  Petitioner contends that his death sentence must be reweighed with consideration of the fact that he was eighteen years old at the time of the offenses (Doc. No. 49 at 108). Petitioner raised this claim in his petition for writ of habeas corpus file with the Supreme

Court of Florida (Ex. P). The Supreme Court of Florida affirmed the lower court's denial of this claim, finding that the claim was procedurally barred because it should be been raised on direct appeal. *Farina III*, 937 So.3d 612, 626 n. 7.[16]

Petitioner has not demonstrated that he is entitled to relief on this claim. In *Roper*, the Supreme Court of the United States held that the death penalty cannot be imposed upon offenders under the age of eighteen when the offense was committed. 543 U.S. at 574. Petitioner's death sentence does not violate *Roper* because he was eighteen at the time the offenses were committed. However, Petitioner asserts he is entitled to have his age mitigator reweighed by a new sentencing jury and judge in light of *Roper* (Doc. No. 56 at 72-73).

During the second penalty phase, defense counsel presented the testimony of Dr. Levin, a psychologist who evaluated Petitioner over the course of several months (Ex. F-26

_____

[16]Although Respondents argue that this claim is procedurally barred because the Supreme Court of Florida found it barred, the Court finds that the claim was not properly barred in the state courts. A federal court is not required to honor a state court's procedural ruling unless that ruling rests upon adequate and independent state grounds. *Harris v. Reed*, 489 U.S. 255, 262 (1989). Federal claims are not barred by procedural default when the state court incorrectly applies its own procedural default law. *Brown v. Sec'y, Dep't of Corr.*, 200 F. App'x 885, 887 (11th Cir. 2006). The Supreme Court of Florida found that Petitioner should have raised the instant claim on direct appeal. However, Petitioner alleges that he could not have raised this claim pursuant to *Roper* because *Roper* was not decided until March 1, 2005. Petitioner's direct appeal became final on June 10, 2002, the date the Supreme Court of the United States denied his petition for writ of certiorari. *Farina v. Florida*, 536 U.S. 910 (2002). Additionally, Petitioner could not raise this claim in his Rule 3.851 motion for post-conviction relief because the motion was denied on April 8, 2004 (Ex. L-3 at 495). Thus, Petitioner raised the claim at the earliest opportunity, on May 27, 2005, in his state petition for writ of habeas corpus (Ex. P). The Court finds that the Florida court incorrectly applied its procedural default law, therefore, the Court will address the claim on the merits.

at 2110-12).  Dr. Levin met with Petitioner on two occasions, administered psychological tests, and considered Petitioner's prior mental health evaluations, his records from childhood residential placements, telephone interviews with friends, family, and a prior therapist, the taped conversation between Petitioner and his co-defendant brother, the taped interviews of the surviving victims, court testimony, police interviews and reports, school records, and state records documenting physical abuse as a child.  *Id.* at 2114.  Dr. Levin opined that Petitioner has "emotional blocks" to his development resulting in his inability to mature due to the abuse inflicted upon him as a child and the fact that he was neglected as a child.  *Id.* at 2117.  Dr. Levin testified that Petitioner had not been able to develop his reasoning or intellectual skills beyond that of a fourteen year old.  *Id.*  Dr. Levin noted that Petitioner had no profile of mental illness, but was categorized as having a dependant personality disorder.  *Id.* at 2123.  Dr. Levin stated that Petitioner had extreme difficulty making everyday decisions without an excessive amount of advice, an extreme need for others to assume responsibility, and an extreme need to be supported by others emotionally. *Id.* at 2123-24.  Dr. Levin testified that Petitioner's diagnosis indicates a very incomplete and immature personality.  *Id.* at 2125.

The trial court, in sentencing Petitioner to death, considered Petitioner's young age at the time the offenses were committed (Ex. F-3 at 358-59).  Moreover, the trial court noted that there was evidence to establish that Petitioner's emotional age was fourteen years old. *Id.* at 359.  The court found the Petitioner acted like an adult in "most of his activities." *Id.* The court concluded that this mitigating circumstance was entitled to moderate weight.

*Id.* The jury was aware of Petitioner's young age at the time the offense was committed and yet they recommended death by a vote of twelve to zero.

Petitioner does not allege that counsel should have submitted additional mitigation evidence regarding his age or maturity to the jury, instead, Petitioner maintains that based solely on *Roper*, the jury and trial court would now weigh the mitigating factor of age more heavily in his favor. Petitioner has not cited to any United States Supreme Court precedent which requires a new penalty phase in circumstances similar to this case. Moreover, Petitioner has not demonstrated that had the sentencing jury and judge been aware of *Roper*, which affords Petitioner no relief, that they would have weighed his age in a different manner or given his age more weight as a mitigating factor. The trial court gave Petitioner's age a considerable amount of weight in weighing the mitigating circumstances in this case. Petitioner has not demonstrated that the state court's determination of this claim was contrary to, or resulted in an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. Accordingly, claim twenty is denied pursuant to § 2254(d).

### R.    *Claim Twenty-One*

Petitioner claims the state court erred in denying his claim of newly discovered evidence that the human brain is not fully developed until age twenty-five (Doc. No. 49 at 113). Petitioner states that this new evidence of a brain mapping study published on May 25, 2004, warrants a new penalty phase because, if presented to a jury, it would likely result in a life sentence given the facts of his case (Doc. No. 56 at 75). Petitioner contends that the

study concluded that the region of the brain that inhibits risky behavior and volitional control is not fully formed until age twenty-five (Doc. No. 49 at 112).

Petitioner raised this claim in his second Rule 3.851 motion for post-conviction relief (Ex. U at 37-38). The trial court denied the claim, finding that even if the study qualified as newly discovered evidence, it was not likely that it would have produced a different outcome had it been raised during the penalty phase hearing (Ex. U at 177). On appeal, the Supreme Court of Florida affirmed the lower court's denial of this claim, finding that the 2004 brain mapping study did not qualify as newly discovered evidence. *Farina IV*, 992 So. 2d at 819 (citing *Schwab v. State*, 969 So. 2d 318, 325 (Fla. 2007) (noting that Florida courts do not recognize "new opinions" or "new research studies" as newly discovered evidence when they are based on data that has been known for several decades)).

Florida courts have held that the 2004 brain mapping study does not constitute newly discovered evidence because it was based on previously available data. *Morton v. State*, 995 So. 2d 233, 245-46 (Fla. 2008) (citing *Schwab*, 969 So. 2d at 325 and *Diaz v. State*, 945 So. 2d 1136, 1144 (Fla. 2006)). The Supreme Court of Florida concluded in *Morton* that although the 2004 brain mapping study had not been published at the time of Morton's trials, Morton or his attorney "could have discovered similar research at the time that states that the human brain was not fully developed until early adulthood." *Id.* (citing Jay D. Aronson, *Brain Imaging, Culpability and the Juvenile Death Penalty*, 13 Psychol. Pub. Pol'y & L. 115, 120 (2007) ("In the past few decades . . . neuroscientists have discovered that two key developmental processes, myelination . . . and pruning of neural connections, continue

to take place during adolescence and well into adulthood . . . [B]rain regions responsible for basic life processes and sensory perception tend to mature fastest, whereas the regions responsible for behavioral inhibition and control, risk assessment, decision making, and emotion maturing take longer (Yakovlev & Lecours, 1967).")).

In considering the fact that psychologists, well before 2004, have been aware that certain portions of the brain do not fully develop until after adulthood, this Court agrees that the 2004 brain mapping study does not amount to newly discovered evidence because this type of evidence could have been discovered through the use of due diligence at the time of the second penalty phase hearing.  Moreover, there is no indication this 2004 study would have resulted in a life sentence if presented to the penalty phase jury.  The Court noted previously that defense counsel presented the testimony of Dr. Levin, who opined Petitioner had blocks to his mental development which led to his inability to mature.  Dr. Levin stated that Petitioner had not been able to develop his reasoning or intellectual skills beyond that of a fourteen year old child.  This 2004 study, which  emphasizes the fact that if a person was subject to trauma that such trauma would negatively impact their maturity and development, would merely be cumulative to Dr. Levin's testimony.  Considering  the evidence that Petitioner planned the robbery, appeared to be calm and collected, herded the Taco Bell employees into the freezer where they heard him state that he had one more precaution to take, after which they were shot, and later stated that he should have slit the victims' throats, this Court finds that there is no reasonable probability that the 2004 study would produce a different sentence.  Additionally, the Court notes that Petitioner has not

cited to, and this Court has not found, any precedent set forth by the Supreme Court of the United States in which it has held this 2004 brain mapping study, or similar studies, constitute newly discovered evidence. Petitioner has not met his burden of demonstrating that the state court's determination of this claim was contrary to, or resulted in an unreasonable application of, clearly established federal law. Accordingly, claim twenty-one is denied pursuant to § 2254(d).

Any of Petitioner's allegations not specifically addressed herein have been found to be without merit.

## IV. *Certificate of Appealability*

This Court should grant an application for certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Lamarca v. Sec'y Department of Corrections*, 568 F.3d 929, 934 (11th Cir. 2009). When a district court dismisses a federal habeas petition on procedural grounds without reaching the underlying constitutional claim, a certificate of appealability should issue only when a Petitioner shows "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. However, a prisoner need not show that the appeal will succeed. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

118

The Court finds that jurists of reason could find it debatable that the denial of claim fourteen was correct. Thus, the Court will grant a certificate of appealability regarding the issues of whether newly discovered evidence that Jeffrey received a life sentence and that Jeffrey had dominion and control over Petitioner warrant a new penalty phase. The Court concludes, however, that Petitioner has not demonstrated that reasonable jurists would find the district court's assessment of his other constitutional claims debatable or wrong, and thus the Court will deny Petitioner a certificate of appealability as to all other claims.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. The Amended Petition for Writ of Habeas Corpus filed by Anthony J. Farina (Doc. No. 49) is **DENIED**, and this case is **DISMISSED WITH PREJUDICE**. The Clerk of the Court shall enter judgment accordingly.

2. Petitioner is **GRANTED** a Certificate of Appealability, as to claim fourteen. The Petitioner is **DENIED** a Certificate of Appealability as to all other claims.

3. The Clerk of the Court is directed to close this case.

**DONE AND ORDERED** in Orlando, Florida, this 26th day of March, 2012.

Charlene Edwards Honeywell
United States District Judge

Copies to:
OrlP-3 3/26
Counsel of Record
Anthony J. Farina